Syllabus.

# Staunton.

## GEORGE D. WHIPPLE v. FIDELITY AND CASUALTY COMPANY OF NEW YORK.

September 21, 1922.

1. ACCIDENT INSURANCE—*Blindness Following Extraction of Tooth—Verdict for Plaintiff Held not Sustained by Evidence—Malpractice—Case at Bar.* In the instant case, an action upon an accident insurance policy, to recover for loss of sight, it appeared that plaintiff while eating some brittle peanut candy loosened the crown of one of his lower jaw teeth. Plaintiff had the tooth extracted by a dentist and protracted treatment was necessary to extract the roots of the tooth and to relieve the plaintiff's pain. During this treatment plaintiff's sight became dim and after the pain was relieved the dimness continued until he practically lost his sight. The uncontroverted testimony in the case was to the effect that the blindness of the plaintiff was due either to primary or secondary atrophy of the optic nerve, and while it was possible that the force exerted by the dentist in removing the tooth might have been sufficient to have caused this optic atrophy, it was "extremely improbable." Indeed, if the dentist had been that violent in his treatment, it could scarcely be considered other than malpractice, for the result of which the defendant could not be held liable. The evidence for the plaintiff negatived the existence of only one of the numerous possible causes of the optic atrophy, and his proof left it more than probable that the cause of the injury complained of was other than the one for the result of which the defendant was liable.

  *Held:* That in such a condition of the proof it was plain that the verdict in favor of the plaintiff was without evidence to support it.

2. JUDICIAL NOTICE—*Bodily Health—Case at Bar.*—It is a matter of common knowledge, of which, therefore, the court will take judicial notice, that one may be robust and feel well, and yet be afflicted with some serious, even mortal, disease. And there was no evidence in the instant case of any probative value on the subject of what was in fact the physical condition of the plaintiff immediately before the dental operation in question, so as to tend to show that he was not prior thereto affected with the atrophy, due to some of its many known causes.

3. Presumptions and Burden of Proof—*Cause and Effect.*—It is true, of course, that the repeated concurrence of a supposed cause and effect tends to show that that relationship exists; and the greater the number of such instances of concurrence which are observed, the stronger becomes the presumption of the correctness of the assumption of the supposed relationship. But it is also true that the failure of the supposed cause to produce the effect in question, on a single occasion, accompanied by the same phenomena, will absolutely destroy the presumption being previously entertained, however well supported it may have seemed to have been by any number of concurrent events; for it thereupon becomes apparent that they were but coincidences, and that the effect which had been observed must have been due to some other cause.

4. Appeal and Error—*Instruction Asking that a Question be Submitted to Jury Held not Sufficient to Estop the Person Asking for the Instruction from Questioning the Sufficiency of the Evidence to Sustain the Verdict of the Jury.*—While it has been held that, where a party is granted instructions upon the theory that there is, or is not, evidence in the case bearing on a certain question, he is estopped from denying that there is, or is not, as the case may be, any evidence whatever on the subject of the instruction; yet that falls far short of holding that such party is, after verdict, precluded from making a motion to set aside the verdict on the ground that it is contrary to the evidence, or without sufficient evidence to support it, and such holding has no application where, as in the instant case, the instruction is upon the subject of the cause of the injury complained of, and there is evidence upon that subject, but that evidence leaves it equally probable that the injury was due to some one of two or more causes, for only one of which the defendant is liable. In such case it is the lack of any preponderance of evidence to support the verdict which leaves it without sufficient evidence to support it.

Error to a judgment of the Circuit Court of the city of Norfolk, in an action of assumpsit. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

This is an action upon an accident insurance policy, brought by the plaintiff in error against the defendant in error. The parties will be hereinafter referred to in accordance with their positions of plaintiff and defendant in the court below.

Under the terms of the policy, the defendant company insured the plaintiff "against disability, or death, resulting directly and independently of all other causes from bodily injuries sustained through external, violent and accidental means, *   *   *," and the policy further provides that if "irrevocable loss of the sight of both eyes shall result from the said injuries within ninety (90) days, the company will pay the assured five thousand dollars, which payment shall terminate the policy."

There was a trial by jury, resulting in a verdict in favor of the plaintiff for $5,000, with interest from February 20, 1920, which was set aside by the trial court on the ground that it was contrary to the law and the evidence, and the judgment under review was entered in favor of the defendant, dismissing the action of the plaintiff.

The following are the material facts and testimony bearing upon the character of the accident, the condition of the plaintiff and the cause of that condition:

On November 7, 1919, the plaintiff was eating some brittle peanut candy, and while doing so the crown of one of his lower jaw teeth, on the right-hand side of his mouth, was loosened. Having to go on a trip to New York, he did not have any treatment given the tooth until his return home, which was on December 2nd or 3rd, 1919. On December 4th or 5th he went to a dentist, Dr. Willis, who removed the crown of the tooth and found that the tooth had been broken off, and advised that nothing could be done except to extract the tooth. What subsequently occurred, according to the testimony of the plaintiff, was as follows:

"Says I, 'If that is your judgment, go ahead.' He (Dr. Willis) put something in my gum to take the pain away or make it as painless as possible, proceeded in a

workmanlike manner to pull the tooth and I sat there and took the pain, pulled on the tooth and pulled the top of the tooth off. What hadn't broken off he pulled off. Then he went to work and drilled, separating the two roots. After he had separated the roots he took his forceps and would ˙pull on one root and the other. Of course he would wash the blood out each time and would break off a little piece and then he would take what the dentists call elevators and try to prize the roots out. Then he would wash it out and then he would drill on the roots to make a place so that the forceps could hold on, and wash it out, and then he would pull with the forceps and pry with the elevators and drill on the roots; and while that was going on I kept nerve back here in my face like that (indicating) and my fists grabbed and the pain increasing each minute until it became almost unbearable to me, as if my leg was being cut off, standing it. And he continued doing that and finally he could not get it out with the forceps he had and he went out of the room and got another pair of forceps and he continued by first pulling on one root and then another and break off pieces and pry with the elevator and wash out my mouth, and I would spit it out again, and then he would drill on the roots again to make a place for the forceps to hold.

"By Mr. Taylor:

"Q. Without going into any more of the minutia of that, will you please tell what the final result was?

"A. At the end of about an hour he said to me, 'I am about exhausted; my hand is sore' and said, 'I can get the roots,' and says he 'How do you feel?' I told him I felt pretty bad, too. So he fixed up my mouth, my tooth, and told me to call around the next morning. I went out of his office holding on to my head (indicating) and went into Mr. Hickford's restaurant and

got a little soup; it was then noon time; and went to my room at my hotel. I held on to my face and my whole head and walked in the room there and out in the hallway, and it seemed as if the pain would get the best of me. And in a little while my partner, Mr. Weaver, came in and he was surprised to see me in that condition, and I said to Mr. Weaver—

"Q. Mr. Whipple, don't say what you said to Mr. Weaver, please sir?

"A. All right.

"Q. Just tell the jury what you did?

"A. I suffered the pain all that afternoon and when night came, people living in the Hotel there, a man and his wife, let me take their hot water bottle. I put that under my pillow and still I could not sleep; wake all night; and the doctor had told me to come back to his office the next morning and I went back there the next morning before he got there, and he took his instruments and he looked at my tooth again, the roots, and didn't do anything except he put on something that he said would quiet the nerve and said, 'Mr. Whipple,' says 'Those roots are small and they will either work themselves out or they will never give you any trouble, and when it heals up come back and I will put in a bridge for you.' Well, I asked the doctor, 'How much do I owe you?'

"Q. Well, you paid him and left, did you, Mr. Whipple?

"A. Yes, sir.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. What did you do then, Mr. Whipple?

"A. I went over to the hotel and to my room and I continued to have this pain which did not let up at all. It just felt as if my head was all numb, and I could hardly swallow, and it felt as if something the day be-

fore had been cutting and burning my eyes out. I continued to walk the floor and the hallway and Mr. Casper, having the room next to me, said to me, Mr. Whipple—

"Q. Mr. Whipple, if you please, don't tell what anyone said?

"A. He was the one that told me to go to Dr. Warden.

"By the Court:

"Q. Captain Taylor has told you two or three times not to tell what was said?

"A. Well, while I was suffering that pain and walking the floor I decided to go to see another dentist, Dr. Warden. I went to see him and told him what had happened and he looked into my mouth and he finally probed around there and felt some roots and he pulled and broke off a small piece and I was suffering intense pain.

"Q. Where was your pain, Mr. Whipple?

"A. In my forehead and my throat and my eyes; in fact, my whole head.

"Q. Had you any pain at all before this operation or before breaking off your tooth?

"A. No, sir; no, sir; none whatever. And he fixed it up with something and it was only a few moments before I was free from pain, the first time in about two days.

"Q. What did he do that relieved that pain?

"A. I don't know; he put something in the sockets there or down there somewhere.

"Q. Put it in the sockets of your tooth?

"A. Yes, sir.

"Q. And did that application relieve the pain in your head and in your throat and in your eyes?

"A. Yes, sir; and I felt like a new man. And we talked over what was best to do and he told me to come in again if it bothered me. I had something to eat and, in doing so, I must have disturbed what he had done, for it commenced aching again, and it went to my head again and my eyes and throat and I ran right over to his office again in the afternoon and he didn't do anything except to pack it again and it quieted down.

"Q. Did that relieve your throat and your head and your eyes?

"A. Yes, sir.

"Q. That packing?

"A. Yes, sir.

"Q. Was the packing confined to the cavity in your tooth?

"A. Yes, sir; absolutely.

"Q. Which tooth was that, Mr. Whipple?

"A. It was the right hand first lower molar, right there (indicating).

"Q. How many applications did Dr. Warden give you?

"A. The second day—he treated from either December 5th or 6th until he left just before Christmas to go home for the holidays and treated it from once to three times a day.

"Q. How long were you in pain?

"A. I was in pain all the time only when he would quiet it and towards the last the pain commenced to go away and my eyes commenced to get dim. In fact, they began getting dim right away from the time I went to his office. They got so dim that when I had that pain I mentioned to him that I could hardly see and when he would quiet the pain I would see all right again.

"Q. And did your pain finally subside?

"A. Yes, sir; just before he went away for the holidays it had gotten down so he was treating it once a day and my pain subsided so—that he told me—I arranged to see another dentist in case I had to have treatments during his absence and when he returned from his Christmas holidays I went into his office and he looked it over and just cleaned it out nicely and said it was healing over fine and he was glad I was going to get all right. I told him I was losing my sight.

"Q. Which was a fact, wasn't it?

"A. Yes, sir; absolutely. I would have spells after that. The doctor got the roots out.

"Q. What were the condition of those roots?

"A. The second day I went to the doctor's I had an X-ray made by Dr. Walker showing the position and showing the roots, and my mouth was so I could not open it enough for the doctor to continue working, besides I had lost my nerve. So he continued to treat it until I could get in better shape and I think it was the 11th of December after the X-ray had been made and everything, he took the roots out nicely with the elevator; quickly too.

"Q. What was the condition of those roots?

"A. The condition of those roots were good; the tooth had never ached.

"Q. Was there any decay in the roots or any evidence of disease?

"A. No, sir.

"Q. The roots were perfectly normal, then, were they?

"A. The roots were perfectly healthy and well. I had to go and be treated every day from December 5th or 6th until the doctor went away for Christmas, from once to three times a day and often at night.

"Q. Can you give any idea when he left for Christmas, if you know?

"A. I think about the 22nd of December.

"Q. So you think the 5th or 6th of December until the 22nd you saw him from once to three times a day?

"A. Yes, sir.

"Q. And the purpose of those visits was to have this cavity treated?

"A. Yes, sir; he did nothing else.

"Q. Were you in pain most of the time when the effects of the treatment would wear off?

"A. All the time.

"Q. And that pain was where?

"A. It was here (indicating) and also in my throat.

"Q. One minute, please, indicate by description where it was?

"A. It was in my throat, my forehead and my eyes and my whole face here (indicating). He would only treat right here (indicating) where the tooth had been taken out, where the roots had been taken out, but when he did treat that he would quiet the pain over my whole head, in fact my whole nerves was affected.

"Q. Had you ever had any trouble with your throat or your head or your eyes before of this description?

"A. No, sir; no, sir.

"Q. What was your age at the time this tooth was extracted?

"A. Fifty-one years old.

"Q. What was your general condition of health?

"A. I think very good.

"Q. What was the condition of your eyes?

"A. Fine. I played billiards and pool; I did all the clerical work for our company over there; I did all the figuring, all the tallies; I did the typewriting; I did the bookkeeping; in fact I did everything. I could see all right. I read the paper nights; I could see all right.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"Q. When did you first notice any trouble with your eyes?

"A. The very day when I first had my tooth pulled, either December 4th or December 5th. I had no more than got back to my room when it felt as if my head was numb, my throat was so sore that I could hardly swallow and my eyes was feeling like something was cutting them out and burning them. I continued to notice it when my eyes got dim and continued getting more and more dim. It started immediately after that tooth had been pulled.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. When did you first have trouble with your eyes?

"A. I noticed the effect the day the tooth was pulled, which was the first day I knew the tooth had been broken, and my sight—my books showed my sight kept being impaired until the last of December, I could see I could not make entries in my books.

"Q. Could you read at all towards the last of December?

"A. No, sir.

"Q. Could you engage in any of the various pursuits that you have mentioned here that you were able to engage in before, around the last of December?

"A. No; not ordinarily. I didn't quite quit the last of December. I could do a few things yet, but I guess about January 12th or 10th I got where I had to give it up, I could not do any further, I was making big figures; if any one gave me numbers I would make great big figures so I could see them, and then I had to quit and get help to do my work and have not been able to do any since."

Dr. Willis did not testify in the case.

Dr. Warden's testimony (a witness for the plaintiff) was as follows:

"Q. Do you know Mr. George D. Whipple?

"A. Yes, sir.

"Q. When did you first meet him professionally?

"A. I think my records show about December 7, 1919.

"Q. Just state please, doctor, to the jury the conditions under which you were thrown in contact with him?

"A. Mr. Whipple came into my office one morning and stated he had been referred to me by a patient of mine to treat his jaw, and after examining it I asked him, of course, the usual questions to how that came about and he explained to me that this tooth had been extracted or attempted to be extracted and he was suffering intense pain and he wanted me to do something to relieve the pain. I gave it the customary routine treatment. As I remember, I irrigated it out and packed some medicine in there to relieve the pain. Of course I probed around too after that to ascertain what condition the socket was in, to see if the roots were loosening up or any projections of bone or any loose particles of bone that I could take out and prevent infection. With that I think I dismissed him until the next morning, and I remember he was very nervous that day.

"Q. What was he complaining of?

"A. Pain.

"Q. Where?

"A. He would take his hands like that (indicating) through his face and when he would lay his head back on chair he said he had difficulty in swallowing, but I didn't attribute that to very much except possible the anesthetic.

"Q. He would indicate by putting his hands over his face?

"A. Yes, sir.

"Q. What portion of his face would he put his hands over?

"A. As well as I remember, he said through his head and through his eyes like a knife.

"Q. And that was what he came to you to treat him for?

"A. Yes.

"Q. That pain of which he was complaining?

"A. Yes, sir.

"Q. You would treat him in what you call the routine manner?

"A. Yes; I figured it was something that very commonly ran in like a neuralgic pain from extraction.

"Q. What effect would this treatment have?

"A. Just local sedative for the area that was injured.

"Q. I say what apparent effect, I am speaking now of this particular patient, Mr. Whipple?

"A. I don't understand the question.

"Q. What apparent effect would this treatment have upon Mr. Whipple so far as relieving the pain was conscerned?

"A. It would relieve the pain.

"Q. This pain of which he was complaining?

"A. Yes, sir.

"Q. How long did you treat him, doctor?

"A. Sometimes once or twice a day until I went home for the holidays.

"Q. I believe you said he first came under your professional care about the 6th or 7th of December?

"A. 6th or 7th, I don't remember.

"Q. And you continued to treat him from one to three times a day until you left for the holidays?

"A. Yes.

"Q. When did you leave for the holidays?

"A. 22nd, I think.

"Q. Of December?

"A. Yes, sir.

"Q. When did you see Mr. Whipple after that?

"A. The next day after I came back.

"Q. Do you recall when that was?

"A. I was home on the 8th.

"Q. Of January, 1920.

"A. Yes.

"Q. What was his condition then?

"A. I think the place was about healed up. That was all I was interested in seeing, his jaw.

"Q. Did you observe any other symptoms then?

"A. No; not that I remember on that day.

"Q. Did Mr. Whipple make any complaint?

"A. I don't recall any complaint.

"Q. But when he first came to your office, either on the 5th or 6th of December, his symptoms as disclosed by his complaint was a pain in his throat, in his jaw, in his head, and in his eyes, is that true?

"A. Yes. Naturally you would have a pain in the jaw and he complained with difficulty in swallowing.

"Q. And did you also say he was complaining of his head and eyes?

"A. Yes.

"Q. What effect would this local application in the cavity in his jaw have upon his eyes and his head so far as the pain is concerned?

"A. It is just a nerve sedative. It is soothing to the nerves at any point and if that other is caused from it it will very often soothe it just as though you can massage a nerve and relieve neuralgia."

Dr. Sylvester (another witness for the plaintiff) testified to the effect that he tested the plaintiff's blood,

at his request, prior to the trial, by what is known as the Wasserman test for syphilis, and found no trace of any syphilitic condition in his blood.

There was no other expert testimony in behalf of the plaintiff.

The defendant introduced two expert witnesses, Dr. Myers and Dr. Gifford, who testified as follows:

"Dr. H. L. Myers.

"Q. Will you state your name and residence and where your office is and how long you have been practicing medicine just as shortly as you can?

"A. H. L. Myers; Taylor building; about 30 years.

"Q. Are you a general practitioner or a specialist?

"A. Eye, ear, nose and throat.

"Q. And have you been practicing that specialty since you began practice?

"A. With the exception of about four years.

"Q. What were you doing then?

"A. Practicing general medicine.

"Q. How long have you been located in Norfolk?

"A. Since 1897.

"Q. And your firm is Myers & Kennon?

"A. Myers, Kennon & Hume.

"Q. In the Taylor building?

"A. Yes, sir.

"Q. Doctor, did you make an examination of this Mr. Whipple who has testified here?

"A. I did.

"Q. You heard his evidence this morning as to the way he suffered and the treatment he received from the dentists, did you not?

"A. I did.

"Q. Now, will you please tell the court and jury just what you ascertained and what you saw and heard from

Mr. Whipple at the time you made this examination. Tell us where and when it was made, please, sir?

"A. I saw him on May 12th.

"Q. This year?

"A. 1920. At that time he could count fingers about a foot from each eye and an examination of the eye showed the nerves to be very white, and he claimed that he had great difficulty in seeing. He could move around and see the larger objects but he could not read and he could not see distinctly anything. He could count fingers at about two feet.

"Q. Can you tell us whether in your opinion the condition of Mr. Whipple's eyes as you saw that condition and as he described it, could have been the result of what he described to you then and what he has stated this morning as an accident to his teeth or to the treatment of his teeth?

"A. Whether it could possibly be?

"Q. In your opinion could it be attributable? I had better change the form of that question, doctor. I will ask the stenographer to read the question?

"Note: The stenographer then read the previous question as follows:

"Q. Can you tell us whether in your opinion the condition of Mr. Whipple's eyes as you saw that condition and as he described it, could have been the result of what he described to you then and what he has stated this morning as an accident to his teeth or to the treatment of his teeth?

"A. I don't know that anything is impossible but it is most improbable.

"Q. In your judgment is there any connection between this accident to his teeth and the treatment of his teeth that he describes and the condition of his eyes which he describes?

14

"A. I can't see it.

"Q. Did you see any evidence of any other and constitutional trouble which might have caused this condition of his eyes of which he complained?

"A. Well, he had optic atrophy; that is the nerves are shrunken, then are white. That optic atrophy is of two kinds, primary and secondary. Primary atrophy would be due—that is an atrophy in which the nerve turned white in the very beginning, begins to shrink and shows no previous *inflamation* to look at—would come from a constitutional cause in the nervous system something like locomotor ataxia. Secondary atrophy would be due to one of four causes; it could follow an *inflamation* of the optic nerve in the eye, and it could follow a break or injury to the nerve of the orbit; or it could follow *inflamation* in the brain, or it could be due to numerous constitutional causes such as rheumatism, typhoid fever, infectious diseases, pneumonia, syphilis, any of those causes could produce this. And when I saw him his nerves were very white and all atrophied. I could not say it was secondary or primary. I had only seen the man once, but that he had atrophy is a certainty.

"Q. Go ahead, doctor.

"A. That is as far as the question went.

"Q. How much of an examination did you make of Mr. Whipple?

"A. I simply examined his eyes in the manner that I have just stated.

"Q. I understand you to say the condition in which he described his eyes did not result from the accident and the operation on his tooth which he described?

"A. I said I could not see any connection.

"Q. Could you find anything from which you thought the condition which he complained of in his eyes did result? Could you trace it to any cause?

"A. No; I could not find any cause.

"Q. He says in his letter here that he had suffered from blood poisoning; he says about a year ago he was hurt and had blood poisoning in his left hand and had other minor accidents, etc. Could a condition such as he complained of have been caused from blood poison?

"A. One of the causes of atrophy is toxemia, but I don't think I know of any such cause.

"Q. Dr. Sylvester says he examined him for indications of syphilis, applying, as I understood, the Wasserman test. I don't know what that is, I suppose it is some technical term. Is that in your opinion an absolute test as to whether he did suffer from syphilis?

"A. It is not absolutely positive.

## "*Cross Examination.*

"By Mr. Taylor:

"Q. Do you know what caused the blindness?

"A. No, sir.

"Q. You won't undertake to say under oath that it is impossible for it to follow from what has been narrated in the evidence here today?

"A. I would not.

## "*Re-Direct Examination.*

"By Mr. Baird:

"Q. I understood you to say it was very improbable in your judgment?

"A. I did."

"Dr. C. B. Gifford

"Examined by Mr. Baird:

"Q. What is your name, please?

"A. C. B. Gifford.

"Q. You live in Norfolk?

"A. I do.

"Q. What is your business?

"A. Dentist.

"Q. How long have you been practicing dentistry?

"A. Fourteen years.

"Q. Are you and Dr. Walker partners or do you have offices together?

"A. We are associated with the firm there of Walker, Gifford and Lee.

"Q. Now doctor, the statement here of Mr. Whipple is that he broke a tooth on the lower jaw or top of a tooth, the crown, that that was followed by trouble which made it necessary for him to seek advice and treatment of a dentist, that dentist gave him quite an extended treatment, removed the tooth and I believe he removed the roots and that subsequent to that time he suffered with an impairment of sight in both of his eyes. I think you heard Mr. Whipple's testimony, didn't you?

"A. Yes, sir.

"Q. Well now, basing your answer upon what I have stated and upon what you have heard Mr. Whipple say not inconsistent with what I have said, will you state whether or not it is possible in your judgment that the condition on which he complained of as to his eyes could have resulted from the occurrences in respect to his tooth which have been mentioned?

"A. Well, from my knowledge of dentistry and medicine I do not see how it is possible to associate the two.

"Q. How could any result from one tooth pass to the eyes, doctor?

"A. I do not see how it could have in this case because there was no pathology shown; the tooth was not diseased.

"Q. Is there any connection between that tooth and the eyes?

"A. The optic nerve—is Dr. Myers here? He will confirm this—is peculiarly a cranial nerve in the fact that most of its entire length is in the cranium; there are no branches or ramifications from it that would be associated with any of the dental nerves.

*"Cross Examination.*

"By Mr. Taylor:

"Q. Doctor, isn't it a fact that dentists are often called in to relieve trouble in the eyes?

"A. Where there is a pathological condition.

"Q. That does exist, does it?

"A. Yes, sir.

"Q. Exists quite frequently?

"A. Very often.

"Q. And now, does advanced science seem to indicate that a great many human ills are due to the teeth?

"A. Yes, sir.

"Q. A great many teeth are extracted because of that?

"A. Yes, sir.

"Q. And that is another part of your profession?

"A. Yes, sir.

"Q. That really has developed since you began to practice?

"A. Yes, sir; in the last eight years.

"Q. And the relation of the teeth to the remainder of the anatomical structure and nerve tissue is being developed every day and better understood?

"A. Yes, sir.

"Q. And that relation is becoming closer as developed by your profession, is it not?

"A. I don't quite get your question, Mr. Taylor.

"Q. I mean by that, your profession is finding closer relation between the teeth and all other parts of the body?

"A. Yes, sir; more conclusively.

"Q. Yes.

"A. As far as septic poisoning.

"Q. And all that has been in the past few years?

"A. Past eight years.

"Q. You confine your work of course to dental surgery?

"A. Yes, sir.

"Q. You are not a specialist of any kind and are not testifying as to such?

"A. That is simply my knowledge of anatomy, yes, sir.

"Q. Dr. Myers is almost the dean of his profession in this city today, is he not?

"A. Man of high standing.

"Q. Highest standing both as a man and physician, is he not?

"A. Yes, sir.

"Q. And when he says he won't say the connection between the optic nerve and the tooth in this case was impossible, you won't disagree with him, will you?

"A. He qualified that statement; he didn't make that statement.

"Q. You heard him say he didn't say the connection was impossible?

"A. He said nothing was impossible.

"Q. Didn't he undertake to say in reply to a question that he would not undertake to say that this was impossible?

"A. I didn't hear him say that.

"Q. You have never seen Mr. Whipple professionally?

"A. No, sir.

"Q. You are simply taking the testimony as it has been related to you or as you have heard it?

"A. Yes, sir; simply as a matter of clinical findings, that is all.

"Q. Doctor, all of the cranial nerves are more or less confined within a narrow space, are they not?

"A. Yes; all within the cranium.

"Q. And they are the most delicate texture, are they not?

"A. Yes, sir.

"Q. Most sensitive, most susceptible to external influence, are they not?

"A. That would depend upon the nature of the influence.

"Q. There is nothing more sensitive in the body than the optic nerve unless it is a dental nerve?

"A. There is one more sensitive than that. The optic stands second.

"Q. It is highly sensitive?

"A. Yes, sir.

"*Re-Direct Examination.*

"By Mr. Baird:

"Q. Doctor, you were called as an expert to give an opinion on the supposed state of facts. That answer you gave me was in the light of all of these modern developments in respect to which Mr. Taylor has been enquiring of you, was it not?

"A. Yes, sir.

"Q. You have no doubt there could be no relation between the two things, that is the injury to the tooth and the condition of the eyes?

"A. In this case this is simply a traumatic condition

induced in the jaw in the breaking of this tooth, there is a simple fracture, there is no pathology, and as I understand dentistry there is no connection between the dental nerve and the eye.

"*Re-Cross Examination.*

"By Mr. Taylor:

"Q. There can be as much physical suffering from a traumatic condition as from any other?

"A. There can when it continues.

"Q. It is not a fact that suffering can be so intense as to produce permanent effect?

"A. Not having practiced medicine, I have never had that observation."

Dr. H. L. Myers, being recalled on behalf of the defendant, further testified as follows:

"Examined by Mr. Baird:

"Q. Doctor, when you were on the stand I omitted to ask you two questions which I should have asked you. Is there any connection between the nerves in the lower jaw and the nerves in the eye?

"A. Why, the optic nerve is the nerve of vision and the fifth nerve which has reference to the pain in the face is a nerve of sensation of the face. One is a sensory nerve and the other is a nerve of sight sense; they are not connected in that way at all.

"Q. The optic nerve is not connected with the nerves of the teeth at all?

"A. Not except in an indirect way.

"Q. Do I understand you to say that you diagnosed Mr. Whipple's troubles as optic atrophy?

"A. Yes, sir.

"Q. Could you tell how long he had been suffering from optic atrophy?

"A. I could not.

"Q. Is that a well known disease, doctor?

"A. Yes, sir.

"Q. Of frequent occurrence?

"A. Frequent.

"Q. Do medical people know to what that is attributable?

"A. Yes, sir; it is attributable to a great many different causes.

"Q. Will you mention them, please?

"A. Atrophy of the optic nerve is divided into two kinds, primary and secondary. Primary atrophy is a condition in which the nerve shrinks, it becomes atrophied directly from the beginning, it does not have to be inflamed first and then followed by atrophy, it starts to shrinking from the beginning and those cases are due to trouble in the nervous system of the spinal cord usually. Secondary atrophy would be due to atrophy following an *inflamation* of the nerve, the last stage of the *inflamation* of the optic nerve, optic neuritis. That is divided loosely into four classes of causes; First, ocular or diseases in the interior of the eye which would affect the nerve by direct continuity, we would say such as retinitis and such diseases around the nerve and involving the nerves in the ball. The second would be orbital and in those cases this is the immediate cause, orbital. If it could be proven that an injury to the orbit could be gotten by pulling a tooth in the lower jaw, which is not connected with the upper jaw, then we might prove the possibility of this being due to a direct injury. That is what would happen in the orbit if you would stick a stick into it, or if you would hit the man a hard enough blow, or if you would jam him in any way hard enough to break

the canal through which the optic nerve runs to the eye you would produce an *inflamation* followed possibly and likely by atrophy. Then because of diseases of the brain, tumors, meningitis, epidemic diseases, rheumatism and so forth *and so forth ad infinitum*, diabetes, Bright's disease and things of that sort. I did not mean that, I mean the atrophy is due to troubles in the brain; then because of constitutional causes due to Bright's disease, diabetes, pneumonia, therumatism, lead poisoning, alcohol poisoning, wood alcohol poisoning and all the different infections or rather intoxications, any of those things could produce an optic atrophy and I have only given just about half of them.

"Q. And what is the ordinary relationship in point of time between the existence of optic atrophy and its manifestation in any outward form, such for instance as impairment of sight?

"A. A man may have optic atrophy visible to the ophthalmoscope for quite a long while before it begins to show trouble in his reading or close vision. He may be able to see quite well and still have optic atrophy perfectly proved.

"Q. Is your judgment that Mr. Whipple suffered from optic atrophy based to any extent upon the way in which this suit came on?

"A. I have already stated that I could not see any connection between the injury and optic atrophy.

"By the court:

"Q. Isn't optic atrophy a progressive disease?

"A. Yes, sir; it leads to blindness.

"Q. Rapid progression?

"A. Sometimes rapid and sometimes slow, but it leads to blindness.

"By Mr. Baird:

"Q. Dr. Sylvester has testified that at Mr. Whipple's request he made a blood test for syphilis. Can you state whether or not you suggested to Mr. Whipple any test that would be absolute in deciding whether he did have optic atrophy?

"A. I suggested both spinal and Wasserman.

"Q. Is the spinal test better?

"A. In cases of this kind it is almost a necessity.

"Q. The spinal test is conclusive?

"A. The spinal test is the best in this case. Neither is absolutely positive. It is the best test we have.

*"Cross Examination.*

"By Mr. Taylor:

"Q. Can optic atrophy result from a blow in the head?

"A. Yes, sir.

"Q. And that is possible to be in instances where there is no direct connection between the point of contact and the optic nerve, isn't it?

"A. Possible, yes; certainly.

"Q. So it is not always dependent upon nervous contact between the point of causation and the optic nerve, is it?

"A. No in the case of a blow.

"Q. What causes primary optic atrophy?

"A. It is caused from locomotor ataxia, and spinal diseases, and *diseases in the brain,* nervous system.

"Q. You have observed no disease in Mr. Whipple, have you?

"A. I have not. I only examined him once and then referred him to the interne to be examined thoroughly.

"Q. You know of no disease he has at all, do.you?

"A. No; I don't."

The interne, referred to at the close of Dr. Myers' testimony, was not a witness in the case.

*Tazewell Taylor,* for the plaintiff in error.

*Baird, White & Lanning,* for the defendant in error.

Sims, J., after making the foregoing statement, delivered the following opinion of the court.

In the view we take of the case it will be necessary for us to consider only one of the questions presented by the assignments of error, and that is this:

[1] 1. Was the verdict of the jury plainly without any evidence of probative value to support it, in its finding that the blindness of the plaintiff was caused by the original injury to his tooth or by the subsequent dental treatment thereof?

The question must be answered in the affirmative.

The uncontroverted testimony in the case is to the effect that the blindness of the plaintiff was due either to primary or secondary atrophy of the optic nerve; that primary atrophy is caused by trouble in the nervous system of the spinal cord usually; that secondary atrophy is caused by inflammation of the optic nerve, which in turn has four classes of causes—first, ocular or disease in the interior eye; second, orbital, in which there is a direct injury to the orbit, or bony cavity of the skull which contains the eye, sufficient to break the canal through which the optic nerve runs from the cranium to the eye, which would produce an inflammation which would likely be followed by atrophy; third, diseases of

the brain, such as tumors, epidemic diseases, rheumatism "and so forth *ad infinitum*," diabetes, Bright's disease "and things of that sort," pneumonia, therumatism, lead poisoning, alcohol poisoning, wood alcohol poisoning and all the different infections or rather intoxications. A witness on this subject, Dr. Myers, in his testimony, which is not controverted by any other witness in the case, stated that "any of those things could produce an optic atrophy and I have only given just about half of them." The testimony is also uncontroverted to the effect that the nerves from the broken tooth of the plaintiff have no direct connection with the optic nerve. That the optic nerve runs from the eye back into the skull and that to break the canal through which that nerve runs there would have to be a thrust of some instrument into the eye socket, or a blow on the head or elsewhere hard enough to break the canal. And that a man may have optic atrophy for "quite a long while" before it affects his vision. "He may be able to see quite well and still have optic atrophy perfectly proved."

The uncontroverted testimony is also to the effect that while it was possible that the force exerted by the dentist in removing the tooth of the plaintiff may have been sufficient to have broken the canal of the optic nerve and have thus caused the optic atrophy, that that was "extremely improbable." Indeed, if the dentist had been that violent in his treatment, it could scarcely be considered other than malpractice, for the result of which the defendant could not be held liable.

But, if it were granted (which is not) that the dental treatment had been shown by the evidence to have been a probable cause of the optic atrophy and it could be held that the defendant is liable for such a result; still, that alone would not have established it as the more probable cause of the injury complained of by the plaintiff.

The evidence for the plaintiff negatives the existence of only one of the other numerous possible causes aforesaid with any degree of positiveness. And when the utmost force and effect is given to the testimony of the plaintiff to the effect that he was not conscious of the presence of any disease, or of the existence of any other cause for the blindness, except the breaking and the extraction of the tooth; and also to the statement of Dr. Myers, who merely examined the eyes of the plaintiff, to the effect that he (Dr. Myers) could not find any cause for the optic atrophy, there remain many other causes, all except one of which, according to the evidence, is equally probable as having been the cause of the atrophy in question as the accident to the tooth of which the plaintiff complains.

We do not have to determine whether this case falls within the principle of the authorities which hold, that, where the ascertainment of the cause of an injurious result to some part of the human body involves subjects about which a layman can have no knowledge at all, the court and jury are so dependent on expert evidence that there can be no other guide, and that in the absence of affirmative expert evidence to support a verdict in such a case, the verdict must be held to be without evidence to support it. See *Ewing* v. *Goode* (C. C.), 78 Fed. 442; *Robbins* v. *Nathan*, 189 App. Div. 827, 179 N. Y. Supp. 281; *Hunter* v. *Burroughs*, 123 Va. 113, 96 S. E. 360.

In the instant case, it is true, there was no affirmative expert evidence to support the verdict; but the plaintiff's position was even worse. The only expert witness on the subject introduced by the plaintiff was Dr. Warden, who testified, in effect, that he attributed the symptoms, which he observed in his treatment of the plaintiff, to the anesthetic, which had been administered to him by the dentist (Dr. Willis), who first treated the

plaintiff, or to neuralgic pain arising from the extraction of the tooth. The other uncontroverted expert evidence in the case shows affirmatively, as above set out, that the proof for.the plaintiff leaves it more than probable that there was some cause for the injury complained of other than the one for the result of which the defendant is liable. In such a condition of the proof it is plain that the verdict in favor of the plaintiff was without evidence to support it.

[2] The plaintiff relies upon certain facts which are shown by the evidence, namely, the facts that plaintiff's vision was not affected until he received the dental treatment following the injury to his tooth; that he was, until that time, robust, feeling well, and in possession of all of his faculties, including sight; that coincidentally with the extraction of the tooth he experienced violent pain in the head, face and throat, and his sight became dim; that when, by means of a local application, the pain was relieved, the dimness of sight was removed, and upon a return of the pain the sight became again dim; and that this connection between the pain and the dimness of sight continued for some fifteen days, while the plaintiff was being treated by Dr. Warden. Merely from this data the conclusion is reached that the dental treatment was the cause of the blindness. There are several obvious defects in this reasoning. First: The assumption is unwarranted that because the vision was not until then affected, the atrophy, which was the cause of the blindness, had no existence until then. This assumption is in direct conflict with the uncontroverted testimony of Dr. Myers, referred to and in part quoted above, in which he says that a man may have atrophy "quite a while" before it affects his vision. Secondly: It is matter of common knowledge, of which therefore the court will take judicial notice, that one

may be robust and feel well, and yet be afflicted with some serious, even mortal disease. And there was no evidence in the instant case of any probative value on the subject of what was in fact the physical condition of the plaintiff immediately before the dental operation in question, so as to tend to show that he was not prior thereto affected with the atrophy, due to some of its many known causes. Plaintiff contented himself with introducing one witness (Dr. Sylvester), proving merely that the plaintiff was free from one form of disease which might have caused the atrophy. Thirdly: The remainder of the reasoning holds good as far as it goes, but it does not go far enough to sustain the conclusion as a sound deduction. It makes no mention of the *data* with respect to the absence of any concurrence of the restoration of sight with the relief of the pain after the first fifteen days during which that coincidence was observed.

It is true, of course, that the repeated concurrence of a supposed cause and effect tends to show that that relationship exists; and the greater the number of such instances of concurrence which are observed, the stronger becomes the presumption of the correctness of the assumption of the supposed relationship. But it is also true that the failure of the supposed cause to produce the effect in question, on a single occasion, accompanied by the same phenomena, will absolutely destroy the presumption being previously entertained, however well supported it may have seemed to have been by any number of concurrent events; for it thereupon becomes apparent that they were but coincidences, and that the effect which has been observed must have been due to some other cause.

And, unfortunately for the validity of the aforesaid reasoning in the instant case, although the dimness of

sight was removed by each treatment during the aforesaid fifteen days, this did not occur thereafter when the pain had been then entirely relieved—which destroys all reliance to be placed on the correctness of the aforesaid conclusion, and tends to show that the blindness was due to some other cause, and one antecedent to, rather than to the pain or the cause of the pain.

A learned writer on the subject of deductive reasoning and of the fallacy of conclusions deduced from a part, instead of the whole, of the *data* available (McCaulay's Essay on Lord Bacon, vol. 2, pp. 239, 240, of McCaulay's Essays and Poems), has illustrated the subject as follows: "We have heard that an eminent judge of the last generation was in the habit of jocosely propounding after dinner a theory, that the cause of the prevalence of Jacobinism was the practice of bearing three names.  He quoted on one side Charles James Fox, Richard Brinsley Sheridan; John Horne Took, John Philpot Curran, Samuel Taylor Coleridge, Theobald Wolf Tone.   These were *instantiae convenientes*" (quoting from Lord Bacon's *Novum Organum*).   "He then proceeded to cite instances *absentiae in proximo*" (again quoting from that great work), "William Pitt, John Scott, William Wyndham, Samuel Horsley, Henry Dundas, Edmund Burke.  *   *   *   In this way our inductive philosopher arrives at what Bacon calls the vintage, and pronounces that the having of three names is the cause of Jacobinism.  *   *   *   If the learned author of the theory about Jacobinism had enlarged either of his tables a little, his system would have been destroyed.   The names of Tom Paine and William Wyndham Grenville would have been sufficient to do the work."

As said in *C. & O. Ry. Co.* v. *Catlett*, 122 Va. 232, 94 S. E. 934:   "*   *   *   the preponderance of the evi-

15

dence rule does not dispense with the requirement that there must be some evidence which has some logical probative value to establish a fact, before that fact can be even considered as a possible hypothesis predicated upon the evidence. * * * *a fortiori*, before it can be considered as the more probable hypothesis from the evidence. In other words, the preponderance of the evidence rule can operate only upon hypotheses to establish which there is some evidence in the case of some logical probative value.".

The following authorities are cited and relied on in argument for the plaintiff upon the subject under consideration, namely: Brumbaugh, Legal Reasoning and Briefing, p. 527; *Shea* v. *Glendale, etc., Co.*, 162 Mass. 463, 38 N. E. 1123; *Taylor* v. *General Accident Assurance Corporation*, 208 Pa. 439, 57 Atl. 830; and *Manufacturers' Accident Indemnity Co.* v. *Dorgan* (U. S. Cir. Ct. of App. 6th Cir.), 58 Fed. 945, 7 C. C. A. 581, 22 L. R. A. 620.

In Brumbaugh, Legal Reasoning and Briefing, page 527, what is said, which is quoted and relied on for the plaintiff, is as follows: "One of the most natural, simple and effective methods of organizing evidence for argumentative purposes is that afforded by the relation of cause and effect. It yields a tremendous leverage in forcing the mind to a conclusion, for the mind, however untrained and elementary in its mode of thought, can not escape the logical cogency of a canvas of facts which furnish an adequate cause, disclose an opportunity, and finally reveal subsequent results *which find no solution or explanation, except upon the basis of the validity of the preceding circumstances.*" (Italics supplied.) This statement is correct and is an admirable illustration of the accuracy and convincing force of the method of deductive reasoning. But, as appears from what is said above,

the proof for the plaintiff does not bring the instant case within the influence of such statement.

In *Shea* v. *Glendale, etc., Co.*, it was decided that proof of the fact that persons, working under conditions like those under which the plaintiff worked, were affected in a manner like that in which the plaintiff was affected, was admissible in evidence as tending to support the inference that they were all injured by the same cause, namely, the poisonous condition of the atmosphere in the room where they worked. Moreover, in that case a physician testified that the illness of the plaintiff was probably a consequence of the poisonous condition of the atmosphere.

In *Taylor* v. *General Accident Assurance Corporation* the plaintiff's intestate died as the result of being injured by a fall. There was an autopsy and affirmative medical expert testimony to the effect that the fall caused the death. The only question at issue was whether the fall was accidental or not accidental; and the court held that as the autopsy disclosed that the fall was not caused by any diseased condition, within the meaning of the insurance policy, the accidental character of it might properly be inferred from the circumstantial evidence.

In *Manufacturers' Accident Indemnity Co.* v. *Dorgan*, also, there was a fall, and an autopsy which disclosed that the fall of the deceased was not caused by any diseased condition, within the meaning of the insurance policy. That being so, the court held that the jury could properly infer the accidental character of the fall from the circumstantial evidence.

A distinguishing feature of both of the two cases last cited, which is wholly absent from the case in judgment, is that, in those cases, there was affirmative evidence, derived from the physical examination at the autopsy of the body of the person injured, to the effect, that the

injury complained of was not caused· by any diseased condition of the person existing prior to the injury.

It is urged in behalf of the plaintiff that the defendant is estopped by asking for instruction No. 1 from taking the position that there is not sufficient evidence to sustain the verdict of the jury in finding that the blindness was caused by external, violent and accidental means, since the question whether such was the cause of the blindness was submitted to the jury at the request of the defendant by that instruction; and authorities are cited in behalf of the plaintiff to sustain that contention, including *Kimball & Fink* v. *Friend*, 95 Va. 135-6, 27 S. E. 901; *Richmond Traction Co.* v. *Clarke*, 101 Va. 392, 43 S. E. 618, and *Gatewood* v. *Garrett*, 106 Va. 554, 56 S. E. 335.

[4] These authorities do hold that, where a party is granted instructions upon the theory that there is, or is not, evidence in the case bearing on a certain question, he is estopped from denying that there is, or is not, as the case may be, any evidence whatever on the subject of the instruction. But that falls far short of holding that such party is, after verdict, precluded from making a motion to set aside the verdict on the ground that it is contrary to the evidence, or without sufficient evidence to support it. And such authorities have no application where, as in the instant case, the instruction is upon the subject of the cause of the injury complained of, and there is evidence upon that subject, but that evidence leaves it equally probable that the injury was due to some one of two or more causes, for only one of which the defendant is liable. In such case it is the lack of any preponderance of. evidence to support the verdict which leaves it without sufficient evidence to support it.

The case under review must be affirmed.

*Affirmed.*

WEST, J., dissenting:

I find myself unable to concur in the opinion of the court delivered by Judge Sims.

In the view I take of the case, it will be unnecessary to consider all the questions raised by the assignment of error.

George D. Whipple, the plaintiff in error, who will be called the plaintiff, brought this suit in the Circuit Court of the city of Norfolk on an accident insurance policy issued by the Fidelity and Casualty Company of New York, the defendant in error, who will be called the defendant, and was awarded a verdict for $5,000, with interest from February 20, 1920, till paid. On December 13, 1920, the court set aside the verdict of the jury, and, without ordering a new trial, entered a final judgment against the plaintiff in favor of the defendant, with costs. To that judgment this writ of error was awarded.

The policy is in the usual form, has been in force continuously since February 15, 1903, and insures the holder "against disability or death resulting directly, and independent of all other causes, from bodily injuries sustained through external, violent and accidental means," and provides that if, "irrevocable loss of the sight of both eyes shall so result from said injuries within ninety days, the company will pay the assured $5,000.00, which payment shall terminate the policy;" and further provides that "immediate written notice must be given the company at New York city of an accident and injury for which a claim is to be made, with full particulars thereof, and the full name and address of the assured. Affirmative proof of death, or loss of limb, or of sight, or of duration of disability, must also be furnished to the company within two

months from the time of death, or of loss of limb, or of sight, or of termination of disability. Legal proceedings for recovery hereunder may not be brought till after three months from date of filing proofs at the company's home office."

On November 7, 1919, the plaintiff was eating some peanut brittle candy and while so doing the crown on one of the lower jaw teeth on the right side of his mouth was loosened and the tooth broken off, and, as a result thereof, it became and was necessary to have the remaining portion of the tooth removed, and in an effort to remove the same, and as a consequence thereof, the defendant became permanently and totally blind.

The plaintiff's only assignment of error is to the action of the Circuit Court of the city of Norfolk in sustaining the defendant's motion to set aside the verdict of the jury and enter judgment for the defendant.

The defendant contends that the action of the circuit court in so doing should be affirmed, for the following reasons:

I. There was no evidence showing any causal connection between the alleged accident and the defective eyesight of which the insured complained.

II. The plaintiff failed to show that the trouble with his eyesight amounted to blindness and that it became total and incurable within ninety days.

III. The plaintiff failed to show compliance with the provisions of the policy, either in respect to giving notice or furnishing proof.

IV. The injury complained of was not the result of an accident.

(a) Has the plaintiff failed to give notice and furnish proof, as required by the contract?

The policy provides that immediate. written notice must be given the company at New York city of any.

accident or injury "for which claim is to be made."   A
substantial compliance with this provision of the con-
tract is all that is required of the insured, and the com-
pany may by its conduct waive its right to rely upon
plaintiff's failure to give notice or furnish proofs, as pro-
vided in the contract.

The evidence shows that during the seventeen years
this policy has been in force the insured has had several
accidents and injuries for which he might have pre-
sented a claim but declined to do so, and that the reason
he did not notify the company earlier was the hope that
he would regain his sight, in which event he did not
expect to present any claim for this injury.

Insurance contracts should be liberally construed in
favor of the insured, and under a fair construction of
the notice clause in the policy  the insured was not re-
quired to give notice of the accident and injury until it
was apparent that the injury was one for which a claim
was to be made.   And, in case of partial disability, the
proof of loss of sight, or duration of the disability was
only required to be furnished within two months from
the termination of the disability.   As soon as the plain-
tiff realized the serious, permanent condition of his eyes,
he at once notified the company's representative and
the company.   He wrote the company's agent on Feb-
ruary 11, 1920, and the company on February 21, 1920.
The company replied on March 6, 1920, enclosing pre-
liminary report and accident claim blank; and on March
11, 1920, plaintiff wrote the company giving a detailed
account of the accident and injury and the then condi-
tion of his eyes.   Upon receipt of this information, the
defendant gave no intimation that it would rely upon
the failure of the plaintiff to give notice in time, but
soon thereafter sent its investigator, Mr. Sharp, to see
the plaintiff, who gave him a complete history of the
case.

The plaintiff had decided to go to see a physician somewhere out of Norfolk, but Sharp, after talking with all the doctors who had been consulted by the plaintiff, requested the plaintiff to postpone his going away until he could bring a specialist representing the company to Norfolk to see him. In order to comply with the company's request in this respect, the plaintiff ceased his activity in prosecuting his claim and postponed treatment by a specialist, who might have, at that time, in some measure, relieved his deplorable condition.

The company's specialist never made his appearance, but, Investigator Sharp, after waiting some time, returned and told the plaintiff that the company denied liability, not on account of the plaintiff's failure to give notice of the accident, but because *there was no accident* which caused the plaintiff's blindness. It appears from the evidence that the defendant at no time prior to the institution of this suit made any objection to the plaintiff's delay in giving notice or furnishing proof.

It is said by the United States Supreme Court in *Railway Co.* v. *McCarthy*, 96 U. S. 258, 24 L. Ed. 693: "Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law."

In *Traveler's Ins. Co.* v. *Harvey*, 82 Va. 949, 5 S. E. 553, this court held that when an insurance company refuses to recognize any claim, such refusal waives compliance with the conditions as to preliminary notice and proof and authorizes immediate suit. This ruling is manifestly fair to the company and is supported by the leading authorities on insurance contracts.

In May on Insurance, page 649, the writer says: "A distinct denial of liability, and refusal to pay, on the ground that there is no contract, or there is no liability, is a waiving of the condition requiring proof of loss. It is equivalent to a declaration that they will not pay, though the proof be furnished, and to require the presentation of proof in such a case, when it can be of no importance to either party, and the conduct of the party in favor of whom the stipulation is made has rendered it practically superfluous, is but an idle formality, the observance of which the law will not require. * * * And a waiver of the proof is a waiver of the condition that payment is not to be made until a limited time after the proof, so that in such case suit may be brought at once upon the denial of liability, although the time within which, after proofs of loss, the payment would be demandable may not have expired.

And in Flanders on Fire Insurance, at page 542, it is said: "The refusal to recognize the evidence of any claim, or a general refusal to pay, renders the delivery of notice and proofs a useless ceremony, and is treated as waiving a strict compliance with the condition as to the preliminary notice and proof, both in respect to form and time."

The New York court held in *Trippe* v. *Provident Fund Society*, 140 N. Y. 23, 35 N. E. 316, 22 L. R. A. 432, 37 Am. St. Rep. 529, that where a notice of a death by accident is given at a later day than stipulated in the policy, but is retained without objection, and the insurer furnished blank proofs of loss, and on being filled out and forwarded, also retains them without objection, and subsequently demands further information, which is furnished, the insurer waives the objection that the notice was not given in time. The policy in question is a New York contract, entered into by the plaintiff while

he was a citizen of New York, and the notice is to be given in New York. Under these circumstances, the ruling of the New York court upon a construction of the notice clause in the contract is controlling in the instant case.

In *Mullen* v. *Read, Guardian,* 64 Conn. 240, 29 Atl. 478, 24 L. R. A. 664, 42 Am. St. Rep. 174, a suit to recover on a life insurance policy issued in Massachusetts, it was held that the contract should be interpreted and construed according to the decisions of the courts of Massachusetts, where the contract was made and was to be performed.

By the weight of authority, and on principle, where the parties have assented to a writing as an expression of their agreement, the standard of interpretation is the local standard. 2 Williston on Contracts, section 607.

In 1 Am. & Eng. Ency. Law & Practice, at p. 387, we find the law stated thus: "Questions frequently arise as to a waiver by the insurer of a failure to give notice of the injury or to furnish proofs of injury or death within the time specified in the policy; and it has been held that in the absence of express waiver some element of estoppel must exist, and that it must be shown that the insured was reasonably misled to this prejudice by some act or declaration of the insurer or its duly authorized agent. However, a technical estoppel is not necessary, it being sufficient if the declarations or conduct of the insurer, subsequent to the breach of the condition, indicate an intention to waive or not to rely on the condition, and the insured or beneficiary is thereby induced to remain inactive, or to incur some trouble or expense; and very slight circumstances are sufficient to establish a waiver of the condition."

The defendant by its conduct, and demand for time in which to bring forward the company's specialist,

caused the plaintiff to be inactive and to occupy a more disadvantageous position than he would have occupied but for the conduct of the defendant in these respects.

It follows from what has been said that if the plaintiff has failed to substantially comply with the provisions of the policy contract as to notice and proof, which I do not admit, the defendant, by its conduct, has waived the right to demand a strict compliance with the conditions of the policy as to preliminary notice and proof.

(b) Was the injury complained of the result of an accident?

The plaintiff's condition could only be brought about by accident, or disease. It appears from the evidence that he was a man fifty-one years old, in robust health and enjoying perfect vision. He was subjected to no medical or surgical treatment which could have affected his eyesight other than that incident to the treatment of his tooth, which was advised by his dentist, and it is not claimed that the dentist who did this work did not do it in a scientific and proper manner.

It is not contended that the breaking of the tooth did not render' dental and medical treatment necessary, and, if the treatment resulted in the injury, the accident and not the treatment was the cause of the injury. If a person carries accident insurance and his leg is accidentally injured so seriously as to necessitate amputation, and the act of amputation so shocks his nervous system as to cause his death, it could not be said that the accident was not the cause of his death.

The case of *Travelers' Insurance Company* v. *Melick*, 65 Fed. 178, 12 C. C. A. 544, 27 L. R. A. 629, was a suit on an accident policy with the provision that injury should result "through external, violent and accidental means alone." The insured accidentally shot himself in the foot, and as a result of the wound thereby

created *tetanus* resulted, and while under the influence of a tetanic spasm he cut his throat with suicidal intent. The policy expressly exempted the company from liability for death by suicide. The court held that the cause of death was directly due to the original accidental gunshot wound and not to the act of insured in cutting his own throat while under the influence of that wound accidentally created.

When an injury is caused by means insured against, and the medical treatment administered is rendered necessary and proper by the nature of the injury, the death of the insured, if caused solely by the injury and the subsequent medical treatment, is "accidental," within the meaning of a policy insuring against death caused by "external, violent and accidental means." *Gardner* v. *United Surety Co.*, 110 Minn. 291, 125 N. W. 264, 26 L. R. A. (N. S.) 1004.

In *Westmoreland* v. *Preferred Accident Ins. Co.* (C. C.), 75 Fed. 246, it was held that if an accident rendered necessary medical treatment, and the treatment resulted in an injury, the accident and not the treatment was the cause of the injury. It follows that the plaintiff's injury was the result of an accident.

(c) Was there any evidence showing any causal connection between the accident and the defective eyesight of which the plaintiff complained?

The undisputed testimony of the plaintiff is that prior to the extracting of the root of the tooth he was a strong, active man, in the enjoyment of very good health, in the possession of all his faculties, and had all his life enjoyed unimpaired eyesight; that immediately after the doctor made an effort to extract the remaining portion of the tooth he had violent pains in his throat, face, head and eyes; that his eyes felt like something was cutting them out and burning them; that these

pains were simultaneous with the pains at the root of the tooth; that he had no pain before the breaking off of the tooth; that when Dr. Warden, his dentist, put some applications in the socket of the tooth it would temporarily relieve the pain in his head, throat and eyes, as well as in the tooth; that the day the tooth was extracted he noticed his eyesight was impaired; that for nearly three weeks he suffered pain simultaneously in the tooth socket and in his eyes all the time, except when the doctor would quiet it; that while in pain, his eyesight would get dim, but, in the beginning of the treatment, when the doctor would quiet the pain his eyesight would temporarily improve; that his sight, notwithstanding the temporary improvement when the pain was relieved, gradually grew worse and continued to grow worse, even after all pain was relieved, until the last of December, when he could not see to write on his books.

While Dr. Warden stated that he did not attribute the plaintiff's *"difficulty in swallowing"* to very much except possibly the anesthetic which had been administered, he did not say he attributed the plaintiff's *symptoms* to the anesthetic, and he testified that when he would treat the tooth socket it would relieve the pain, not only at that location but also in his eyes, and that he continued these treatments two or three times a day for over two weeks.

Dr. Myers, the eye specialist, introduced as an expert witness for the defendant, who examined the plaintiff's eyes, delivered quite a discourse on primary and secondary atrophy of the optic nerve and named numerous causes which *could* produce optic atrophy, but frankly admitted that it was possible that the optic atrophy of which the plaintiff was suffering was the result of the accident to his tooth, or the treatment of his tooth; and

that he could not find anything from which the condition of his eyes resulted. There is nothing in his testimony which shows that the plaintiff had optic atrophy before the accident, or that the verdict of the jury was wrong, as will appear from the following questions and answers:

"Q. Do you know what caused the blindness?

"A. No, sir.

"Q. You won't undertake to say under oath that it is impossible for it to follow from what has been narrated in the evidence here today?

"A. I would not.

"Q. You know of no disease he has at all, do you?

"A. No, I don't.

"Q. Could you find anything from which you thought the condition which he complained of in his eyes did result? Could you trace it to any cause?

"A. I could not find any cause."

Dr. Myers also caused a blood test to be made of the plaintiff's blood to ascertain the presence of latent diseases, but found none. He then turned him over to an interne to be examined thoroughly, but this interne was never sworn as a witness for the defendant. The company's specialist from a distance, to whom the plaintiff agreed to submit for an examination, neither made an examination nor appeared as a witness for the defendant. It is fair to infer that the examination of the interne disclosed nothing which would sustain the defendant's theory of the case, and that the defendant reached the conclusion that its defense would not be strengthened by an examination made by its own specialist.

The defendant's position, in effect, is, that the plaintiff cannot recover because he failed to introduce a medical witness who would give opinion evidence to the ef-

fect that the violent pains, which resulted from extracting the roots of the tooth and were communicated to his eyes, caused his eyesight to become impaired to such an extent as to produce total blindness. In this contention I cannot concur.

Of course, there are cases involving highly technical questions, where the jury must rely upon expert testimony, as in cases of malpractice, in which the only way to prove a want of skill on the part of medical practitioners is by expert evidence. And it will be observed that most of the cases cited by the defendant to sustain its position on this point belong to this class.

The cases of *Ewing* v. *Goode* (C. C.), 78 Fed. 442; *Hunter* v. *Burroughs,* 123 Va. 113, 96 S. E. 360, and *Robbins* v. *Nathan,* 189 App. Div. 827, 179 N. Y. Supp. 281, relied on strongly by the defendant, were all cases of alleged malpractice.

In *Ewing* v. *Goode, supra,* Judge Taft says: "In many cases expert evidence, though all tending one way, is not conclusive upon the court and jury, but the latter, as men of affairs, may draw their own inferences from the facts, and accept or reject the statements of experts; but such cases are where the subject of discussion is on the border line between the domain of general and expert knowledge * * *."

The test of the sufficiency of the circumstances adduced always is, that, viewed as a whole, they reasonably exclude, by their preponderating probative weight, any other explanation based on the evidence. *Phila. Trust Co.* v. *Phila., etc., R. R. Co.,* 160 Pa. 590, 28 Atl. 960.

It was held by the court in *C. & O. Ry. Co.* v. *Catlett,* 122 Va. 232, 94 S. E. 934, that "in civil cases the reasoning to establish a fact is not required to measure up to the *exclusion* of every other hypothesis consistent with

the evidence; that it is required only that the fact considered as established be the more probable hypothesis from the evidence with reference to other hypotheses predicated upon the evidence—that is to say, in civil cases, a fact may be established by a preponderance only of the evidence.  But the preponderance of the evidence rule does not dispense with the requirement that there must be some evidence which has some logical probative value to establish a fact, before that fact can be even considered as a possible hypothesis predicated upon the evidence—*a fortiori*, before it can be considered as the more probable hypothesis from the evidence."

It follows that the plaintiff was not required to prove that he was free from every form of disease which could have caused the atrophy, but was only required to satisfy the jury that it was more probable from the evidence that the atrophy was caused by the accident to or medical treatment of the tooth, than from any *other cause predicated* upon the evidence; and to so satisfy them with evidence which has some logical probative value. This the plaintiff has done.

The previous good health and perfect vision of the plaintiff, the repeated recurrence and concurrence of the pain and the dimness of sight as long as the pain lasted, covering a period of over fifteen days, during which time the impairment of the sight was increasing, the reasonable inference that the optic nerve had become so diseased by the shock and pain that the plaintiff's sight continued, as a result thereof, to grow worse after the pain had subsided, and the fact that Dr. Myers, the eye specialist, upon an examination of plaintiff's eyes, could find nothing to make him think the optic atrophy was in existence before the accident, are facts and circumstances of logical probative value which

reasonably exclude, by their preponderating probative
weight, any other explanation, based upon the evidence,
than that the plaintiff's blindness resulted from the ac-
cident to or necessary medical treatment of his tooth,
and furnish *prima facie* proof which has not been re-
butted that the optic atrophy was not in existence prior
to the accident.

In order to ascertain whether there is any causal con-
nection between the accident and the defective eye-
sight we need, not the opinions of additional experts,
but simply to give due weight to the other evidence in
the case and apply the everyday method of reasoning,
that effect always follows from cause. The positive un-
contradicted testimony of the plaintiff is that when he
had pain in the cavity of the tooth, he had pain in his
eyes, which impaired his sight, and when by local treat-
ment the pain in the cavity was allayed the pain left
his eyes and his sight was, at first, temporarily im-
proved, but grew worse each time, and finally when the
pain subsided the optic nerve was so much diseased
that the impairment of sight increased until it resulted
in his total blindness. Add to these facts the fact of the
previous good health and perfect vision of the plaintiff
and the lack of any other cause to which impaired
vision could be attributed, and the statement by Dr.
Myers that optic atrophy may be caused without con-
tact with the optic nerve by blow or physical shock, and
that the extracting of the tooth might possibly have pro-
duced optic atrophy, and it cannot be said that the ver-
dict of the jury, finding that the breaking of the tooth
and the subsequent medical treatment thereof were the
cause of the injury complained of was plainly wrong, or
without evidence of probative value to support it.

The fact that the dimness of the sight did not retain
its improvement after the pain had been entirely re-

16

lieved does not, as contended by the opinion by Judge Sims, destroy the reliance to be placed on the correctness of the conclusion that the repeated concurrence of cause and effect tends to prove that that relationship existed, since it plainly appears from the evidence that, notwithstanding the temporary improvement of the sight when the pain was temporarily allayed, the impairment of the sight greatly increased during the fifteen days the tooth socket was treated for the pain, and the reasonable inference is that the optic nerve had become so much diseased, as a result of the shock and pain, that it continued from that cause to grow worse, rather than better, after the pain had completely subsided.

(d) Does the evidence show that the trouble with plaintiff's eyesight amounted to blindness, and that it became total and incurable within ninety days?

The plaintiff testified that he could do a few things the last of December, but about the 10th or 12th of January he had to give up. His son testified that the only clerical work the plaintiff could do about January 1, 1920, was to endorse checks and drafts by his directing his hand, and that he could not do this unassisted. Geo. S. Whipple, his son, also testified that on February 1st, following the accident, plaintiff did not recognize him until he spoke, although he was in front of him with his hand on his arm.

H. M. Kirby testified that plaintiff comes to his office and buys cigars and he can't tell silver money, except by the notches on it, with his finger nails. This is peculiarly a case for the jury. They saw the plaintiff on the witness stand; and the facts and circumstances surrounding the case were sufficient to warrant the jury in reaching the conclusion that his blindness became total and incurable within ninety days.

By asking for instruction No. 1, the defendant seems

to have recognized the existence of evidence which, if the jury believed it, would sustain a verdict for the plaintiff.

Instruction No. 1, given at its request, was as follows: "The plaintiff cannot recover unless they believe from the evidence that he is totally and permanently blind in both eyes, and that such loss of sight is irrecoverable and resulted directly and independently of all other causes, from external, violent and accidental means within ninety days from the date at which said injuries were sustained, and that immediate written notice of the accident was given the defendant at its home office in New York with full particulars, and affirmative proof of the loss of sight furnished the defendant within two months from such loss of sight, unless the jury shall find from the evidence that the giving of such notice and such proof of loss of sight were waived by the conduct of the company."

By the foregoing instruction, at defendant's request, the court submitted to the jury the questions of waiver by the company of notice and proof of loss, of plaintiff's total and incurable blindness, and whether, if it existed, the same resulted from external, violent and accidental means within ninety days of date of injuries.

In *Spicer* v. *Webster City*, 118 Iowa, 561, 92 N. W. 884, we find this: "A city in an action against it for injuries requested an instruction which submitted the issue whether it had actual notice of the defect, and the court submitted such question to the jury by an interrogatory, which was answered in the affirmative. It was held on appeal that the city, by requesting the instruction in question, could not complain that the answer to the interrogatory was unsupported by evidence. This would seem to be not only common sense, but simple justice."

In *Kimball & Fink* v. *Friend's Adm'r*, 95 Va. 135, 136, 27 S. E. 902, this court said: "By the third instruction given for the plaintiff, the jury were instructed that if the defendants could in the result, by the exercise of ordinary care and diligence, have avoided the accident, the negligence of the plaintiff's intestate would not excuse the railroad company. This instruction is objected to on the ground that there was no evidence tending to show that the accident could have been avoided after the peril of the deceased was discovered. * * * *.

"Not only did the plaintiff and the court think that there was evidence tending to prove the facts upon which that instruction was based, but the defendants admitted (and now are estopped from denying) that there was such evidence by asking the court in their fourth instruction to tell the jury that if they believed certain facts they must find for the defendants, 'unless they further believe that after perceiving the negligence of the plaintiff's intestate, they could have avoided the effect of such negligence by the exercise of ordinary care.' "

In *Gatewood* v. *Garrett*, 106 Va. 554, 56 S. E. 336, the court makes this statement: "It is true that the instruction could not be considered if the existence of the evidence upon which it rests could only be ascertained by looking at the imperfect certificate of such evidence found in the record; but where the plaintiff has asked for instructions which are plainly predicated on the existence of such evidence, he is estopped from denying its existence."

A party is estopped to complain of the judgment for insufficiency of evidence to sustain it when, on the trial, he supplied the deficiency by his own evidence; or he admitted the existence of the facts which such evidence

would have established, either by asking an instruction based thereon, or by stipulation, or by concession. 3 Cyc. 246.

Instruction No. 1 told the jury the plaintiff could not recover unless they believed from the evidence certain facts, and they returned a verdict for the plaintiff. Having taken the position that there was evidence upon which the jury might rest such a verdict, the defendant cannot now be heard to deny the existence of such evidence.

The weight of the evidence and the credibility of the witnesses were questions for the jury. The evidence in the record was ample to support this verdict, and the circuit court should not have set it aside.

For the foregoing reasons, I am of the opinion that the judgment complained of is erroneous and should be reversed, and judgment entered here in favor of the plaintiff against the defendant for the amount ascertained by the jury, with interest and costs.

KELLY, P., dissenting:

In my view of the evidence, the question whether the plaintiff's blindness more probably resulted from the accident than from some other cause was one which addressed itself to the jury, and for this reason I am unable to concur in the opinion of the court.