# Richmond

B. H. Swersky and Abe Swersky, Partners Trading &C. v. Alice L. Higgins.

June 8, 1953.

Record No. 4060.

Present, Eggleston, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*H. Lee Kanter, W. R. Ashburn,* for plaintiffs in error.

*James G. Martin & Sons, W. L. Devany, Jr.,* for defendant in error.

BUCHANAN, J., delivered the opinion of the court.

Appellants, partners trading as Colgate Construction Company, defendants below, contracted to furnish and apply to the exterior of the residence of Alice L. Higgins, plaintiff below, for the sum of $505, which was paid, a paint-like material called Re-Nu-It, advertised as a product which would seal, insulate, beautify and protect the surface. A sign placed by the defendants in the front yard while the work was being done announced, "You Never Need Paint Again." The material was applied to the house in April, 1951, under pressure by means of a spray gun. Some weeks later the house began to turn from an original white to a dark color; dampness and mildew or mold appeared on both the outside and inside and rotten places developed in some of the trim.

The plaintiff brought this action for damages, based on an alleged breach of warranty, claiming that the trouble had been caused by the material so applied. A jury returned a verdict for her in the sum of $2,250 "for repairs to exterior of home" and the court entered judgment thereon. The defendants' assignments of error raise questions as to admission of testimony, the sufficiency of the evidence, rulings on instructions and the reference in argument to a picture which had been rejected.

Defendants contend, first, that there was prejudicial error in allowing two of plaintiff's witnesses, Johnson and Brown, to give opinions as to the cause of the mold and discoloring without being qualified as experts to express such opinions. Both of these witnesses were general contractors. Johnson testified that he had made a thorough examination of the house and an estimate of what it would cost to repair it, $4,218.48. He was then asked, "What is the matter with the house, and what was the cause of the trouble?" He replied, "From the application of the material that has already been applied." Defendants' counsel objected and the court observed that a general contractor would ordinarily know from general knowledge and ought to be able to tell why he thinks it necessary to repair a house he is called upon to repair. The question was then repeated and the witness proceeded to testify as to the conditions he found on the

outside and on the inside of the house, caused, in his opinion, by excessive dampness on the inside and in the exterior walls, discoloring the shingles and changing the appearance of the house. Objection was again made because "no foundation has been laid to show what caused the damage." The court ruled: "He is saying why he feels the repairs should be made." At the end of the examination in chief, defendants' counsel renewed his objection to admitting the estimate on the ground that the witness had testified that in his opinion the damage was due to mildew and no causal connection had been shown between Re-Nu-It and this mildew.

The witness Brown testified that he, too, had made a thorough inspection of the house and an estimate of the cost of repair, which he put at $4,201. His estimate was objected to "on the same grounds as previously stated." He was then asked, without objection, the same question asked of Johnson, what was the matter with the house and what caused the trouble, and he replied that he did not know but would say it was mildew or a fungus growth.

It is clear, we think, that these witnesses were not undertaking to testify as experts in chemistry or bacteriology, as defendants claim, but within their own field as to the conditions they found and the cost of making repairs. The defendants also introduced two general contractors. One was asked what, on the basis of his examination of the house, caused the dampness which in turn caused the mold. He said it was the lack of foundation vents. It was inquired of the other whether in his opinion as a general contractor the application of Re-Nu-It had any connection with condensation and mold. He answered in the negative. If there was error in allowing the questions of plaintiff's counsel, and we see none, it was cured by the similar questions by defendants' counsel. *Adams* v. *Ristine,* 138 Va. 273, 289, 122 S. E. 126, 130.

A trial court will not be reversed for allowing a witness to testify as an expert unless it appears clearly that he was not qualified in the field in which he gives evidence, as the question of his qualification is largely in the discretion of the trial court. *Richmond Locomotive Works* v. *Ford,* 94 Va. 627, 641, 27 S. E. 509, 510-11; *Savage* v. *Bowen,* 103 Va. 540, 545, 49 S. E. 668, 669; *C. & O. Ry. Co.* v. *Meyer,* 150 Va. 656, 671, 143 S. E. 478, 483.

Defendants next contend that there was not sufficient

evidence to show that the material they applied was the cause of the mildew and discoloration. They do not deny that there was a condition of mildew and discoloration, although they disagree with plaintiff's witnesses as to the extent of it. The defendants made no express warranty in their contract for applying the material, but they were bound by an implied warranty that it was reasonably fit for the purpose for which it was applied. *duPont Co.* v. *Universal Moulded Prod.* 191 Va. 525, 566, 62 S. E. 2d 233, 252. If its use on the plaintiff's house brought about the conditions of mold, discoloration and deterioration shown by the evidence, then there was a breach of this implied warranty and defendants are responsible for the damage. Causal connection may, like any other fact, be proved by direct or circumstantial evidence, or both. The plaintiff, possessed of a verdict approved by the trial court, is of course entitled to have the evidence viewed in the light most favorable to her.

Plaintiff's house was built by her and her husband and they moved into it in January, 1947. In the four years following there had been no dampness or mold or discoloring until Re-Nu-It was applied. That fact of itself is evidence to be considered on the ultimate fact of causal connection. There was a degree of logic in the answer of one of the general contractors who was asked by defendants' counsel on cross-examintaion why the kitchen walls were discolored. He replied that if they did not show discoloration and dampness prior to the application of Re-Nu-It, and did afterwards, he would think it would be because of the application of Re-Nu-It.

The plaintiff introduced the chief chemist and director of the Department of Bacteriology of a firm of testing and inspection engineers of recognized standing. He testified that he examined samples of shingles, trim and other materials taken from the house and that there were discoloring and mold on the exterior and in the interior and disintegration of some of the wood from ground rot fungus. He made tests of the material that had been applied and found it to have a high organic content which would very definitely support the growth of mildew and fungus which would tend to disintegrate the material on which it was put. He testified that Re-Nu-It was not like ordinary paint; that it had a greater sealing effect, a much thicker film, providing a barrier highly resistant to the passage of moisture and preventing proper "breathing," causing mildew, deterioration

of the wood and discoloring of the finish. He also examined the house to see that the materials which he had examined fairly represented the condition of the house. He found the house deteriorated, with mold in all sections, the outside walls dirty, off color and giving a mottled effect.

Other witnesses for the plaintiff, general contractors, supported the chemist on the point that the mildew was due to moisture which came from lack of breathing or proper ventilation, not caused by any structural defects. One of them, Saunders, in answer to a question by defendants' counsel on cross-examination said "the outside wall has had a preparation that has sealed the outside wall and killed the breathing of the wall." Defendants' counsel asked him this: "In your opinion as a general contractor, do you mean to say that before this substance was put on there probably was very little molding inside of the house and on the walls?" He replied, "I think I would be safe in saying that there was probably not any." Plaintiff's witnesses testified that the basement was dry and that there were proper vents in the foundation and that the damage could be repaired only by removal of the shingles and outside trim and some, at least, of the damaged material on the inside.

The defendants likewise introduced an expert chemist and bacteriologist who testified that Re-Nu-It was no more organic and would not produce a condition any more favorable to mold spore growth than ordinary paint. His testimony and that of general contractors was to the effect that Re-Nu-It did not make the house any more air-tight than ordinary paint; that the mold growth was caused by dampness in the house which in turn was produced by lack of proper foundation ventilation, leaky roof and improper dormer flashings.

There was, in fact, a direct conflict in the testimony on practically all material points. Defendants seem to recognize this to be true. They say in their brief: "The opinions of the various experts were in conflict with respect to both questions," referring to the plaintiff's contentions that there was damage both inside and outside because Re-Nu-It had sealed the house so moisture could not escape and thereby caused the mold growth.

In this state of the evidence we necessarily conclude, to paraphrase the language of Judge Kelly in his dissenting opinion in *Whipple* v. *Fidelity & Cas. Co.*, 134 Va. 195, 245, 113 S. E. 878, 893, decided on different facts, that the question of whether

the damage more probably resulted from the application of Re-Nu-It than from some other cause was one which addressed itself to the jury.

We find no error in the challenged rulings on instructions. P-2, complained of, told the jury that if the coating on the house was not reasonably fit for that purpose and damaged the house, they should find for the plaintiff. It was but a corollary of P-1, given without objection, stating defendants' duty. Instruction A, refused, would have told the jury that unless Re-Nu-It did not furnish a protective coating for the house they should find for the defendants. Obviously it omitted reference to the important factors of discoloration, mildew and deterioration.

The refusal of Instruction E was the only ruling argued at bar. It would have told the jury that if the plaintiff was entitled to damage for discoloring, and that trouble could be remedied by a cleaning method, then plaintiff's recovery should be limited to the cost of cleaning the mold so far as the damage to the exterior was concerned. Evidence to support the instruction was quite flimsy. Defendants' expert said that "theoretically" the cleaner would clean the shingles, but he couldn't say the cleaning would be more than temporary. Aside from that, and in itself sufficient to warrant refusal of the instruction, was the fact that the plaintiff's evidence showed physical damage to the exterior in addition to the discoloring.

Several days after the verdict the attorney who represented the defendants in the trial renewed his motion to set the verdict aside and filed his affidavit to the effect that a picture of a neighboring house to which Re-Nu-It had been applied, and which showed similar discoloring, but which picture the court had refused to admit into evidence, and which had been left on the judge's desk, had, without affiant's knowledge, been shown to the jury by plaintiff's counsel in their closing argument and taken by the jury to their room. The affidavit was stated to be "upon information, belief, and knowledge," and in submitting the motion defendants' counsel said "if it was done I am sure it was an inadvertence."

Plaintiff's attorney who made the closing argument filed his affidavit to the effect that he did not consciously refer to any exhibit not in evidence; that he did not pick up any exhibit from the judge's desk, and he thought that defendants' counsel assisted in selecting the papers that were sent to the jury room.

The court explained that the city sergeant discovered the error and brought the picture back to the judge before the jury had an opportunity to look at any evidence or discuss it. No prejudice could have resulted from this incident and the motion based on it was properly overruled.

The judgment complained of is

*Affirmed.*