## Richmond

MARGARET A. NOLL, ADMINISTRATOR, etc.

v.

FREDERICK RAHAL, M.D., et al.

January 12, 1979.

Record No. 770752.

Present: All the Justices.

*Robert Cantor (Abraham J. Dere; Cantor and Cantor*, on briefs), for plaintiff in error.

*R. Carter Scott, III; Kimberly T. Henry (Browder, Russell, Little, Morris & Butcher*, on brief), for defendants in error.

COMPTON, J., delivered the opinion of the Court.

In this medical malpractice case, the plaintiff challenges the trial court's ruling that her proffered expert witness was not qualified to testify concerning the standard of care applicable to pediatricians practicing their specialty in the metropolitan area in question at the time this cause of action arose.

Appellant Margaret A. Noll filed suit in May of 1976 in her representative capacity against appellees Frederick Rahal, M.D. and Michael Jaffe, M.D. for the alleged wrongful death in 1974 of her eleven-year-old son, David Glenn Noll. She alleged that the physicians, both pediatricians practicing in the City of Richmond-Henrico County metropolitan area, negligently failed to diagnose and treat Rocky Mountain spotted fever which caused her child's

death. In their pleadings, defendants specifically denied these allegations.

During the jury trial, the court refused to permit the witness, Dr. Lloyd Kramer, to express his opinion to the jury. Thereafter, the court struck the plaintiff's evidence at the conclusion of her evidence-in-chief and entered summary judgment for the defendants. We granted the plaintiff a writ of error to the February 1977 final order.

On May 20, 1974, plaintiff's decedent awoke suffering from neck pain and from discomfort behind one ear. Noticing that a "gland" behind the boy's ear appeared swollen, the mother took her son to the Henrico County office of the defendants, who were associated in the practice of pediatrics. The child was examined by defendant Jaffe who concluded that David had a virus. The only treatment recommended was use of a non-prescription medication, Tylenol. The mother testified that subsequent to the diagnosis but before leaving the physicians' office, she remembered that David had previously told her that his head was "sore." She stated that she then called this complaint to Jaffe's attention who, upon examination, pointed out to her a "tick bite" on the side of the head. She testified that thereafter the diagnosis was not changed and she took David home.[1]

David's condition worsened and on May 22 a rash appeared on his body. Following an office examination by Jaffe on that day, the illness was diagnosed as measles and the plaintiff was instructed to continue use of the Tylenol. David's situation continued to deteriorate and on Saturday, May 25, the plaintiff telephoned the defendants' office. She spoke with Dr. Rahal, related the child's symptoms, and told him of Jaffe's diagnosis of measles. Rahal then prescribed medication over the telephone to control the child's vomiting.

The following day, David was "considerably worse" and the plaintiff took her son to the defendants' office that afternoon to see Rahal. The boy collapsed at the office and went into convulsions. He was then rushed to a hospital in Henrico County where it was determined that the child had Rocky Mountain spotted fever from which he died on May 28 at the Medical College of Virginia Hospital.

---

[1] In his opening statement to the jury, defendants' counsel stated that Jaffe would deny that any tick bite was called to his attention at the time or that he discovered any insect bite on the child during this initial examination.

The proffered testimony of the witness Kramer, taken out of the jury's presence, was that the defendants had negligently diagnosed and treated the decedent. Kramer further testified that had the defendants made a timely diagnosis of Rocky Mountain spotted fever, and instituted proper treatment, the child would have "survived the onslaught" of the disease.

During the proffer, Kramer, a pediatrician, testified that he was 36 years of age and resided in Northern Virgnia at McLean. He stated that he received his undergraduate degree in 1962 and his Doctor of Medicine in 1966, both from the University of Maryland. He performed a "straight pediatric internship" for two years at a Baltimore, Maryland hospital followed by a third year of residency at the University of Florida Hospital. Following the internship, Kramer practiced pediatrics for two years in South Carolina until 1971 while serving in the Air Force. For the next two years, he "did a fellowship" in newborn medicine at Georgetown University in the District of Columbia, obtaining "some training experience in Virginia" during that time. During the period commencing after completion of the fellowship in 1973 up to the February 1977 trial, Kramer had been Director of Nurseries at the Fairfax Hospital in Falls Church.

Kramer became "Board certified" in pediatrics in 1972 and in newborn medicine in 1975. He had authored three articles in the field of pediatrics which appeared in medical publications in 1969, 1975 and 1976.

He testified that, in general, newborn medicine involves care and treatment of infants up to six months of age and that his medical practice since 1973 had been limited primarily to that age group. He stated that from July of 1973 to May of 1974 he had treated a "very limited number" of children over six months old and this experience was in consultation with other physicians. He further testified that since his arrival in Virginia in 1973 he had not seen or treated any patients for Rocky Mountain spotted fever, although he had treated the disease previously; that while he had seen patients with measles following his coming to Virginia, he had not treated any such patients; and that he had never practiced medicine in the City of Richmond or in Henrico County.

Kramer testified that he was familiar with the standard of care used by physicians who practiced pediatric medicine in the metropolitan area of Richmond in May of 1974. He set forth the following bases for this familiarity.

First, he stated that he was a member of the Medical Society of Virginia. Also, he regularly read one of the Society's publications, "The Virginia Monthly", which had articles written by Virginia physicians on all phases of medicine including pediatrics. He testified that such articles "would lend themselves to what is felt to be the proper standard of care for physicians practicing in the State of Virginia." He could not recall seeing any articles in that journal on the management of patients with Rocky Mountain spotted fever, but he testified that in his reading "over the course of the years" in the field of pediatrics generally, he had reviewed current articles in national publications about the disease in question. This study, the witness said, revealed the means by which the disease was treated and the accepted medical practice for this particular malady. He stated that "the standard of medical practice for this illness seems to be fairly uniform throughout the country."

In addition, he said that he participated in meetings throughout Virginia "periodically" which allowed him to "interact with physicians from all parts of the state and hear what their criteria for proper medical care is." He stated that he did not recall having discussed the diagnosis and treatment of Rocky Mountain spotted fever with any Virginia practitioner. At the time of trial, Kramer was planning to participate two weeks hence in the annual meeting of the Virginia Chapter of the "Academy of Pediatrics."

Furthermore, Kramer had been teaching pediatrics and newborn medicine, at the Fairfax Hospital, to family practice residents from Richmond's Medical College of Virginia. As a result of these teaching duties, Kramer stated he had "discourse" on pediatric medicine with the physicians in charge of the teaching program at that college. Kramer stated that he was "personally familiar" with one pediatrician in the Richmond area, who was on the college medical staff in the Department of Pediatrics.

Summarizing, Kramer stated that because of his experience, his "current awareness" of the disease, and his contact with physicians throughout Virginia which "represent a reasonable cross-section of practicing pediatricians", he felt "competent in assessing the treating of Rocky Mountain spotted fever."

In moving to exclude Kramer's testimony, the defendants' sole contention was that the plaintiff had not established "within reasonable latitude" Kramer's "familiarity" generally with the practice of pediatrics, or his specific knowledge of such practice in the Richmond metropolitan area. Stating that he was guided by our

recent cases of *Bly* v. *Rhoads*, 216 Va. 645, 222 S.E.2d 783 (1976) and *Little* v. *Cross*, 217 Va. 71, 225 S.E.2d 387 (1976), the trial judge ruled that Kramer was not qualified to testify about the professional standard required of pediatricians practicing in the Richmond-Henrico County area in 1974.

The question presented is whether the trial court abused its discretion in disqualifying the plaintiff's proffered expert witness.

Distinguishing factually *Bly* and *Little* from this case, the plaintiff argues that the court below erred. She points out that the qualifications of the out-of-state witnesses in those two cases were clearly inferior to the credentials of Dr. Kramer in this case. She contends that Kramer was "intimately acquainted with the practice of pediatrics throughout Virginia as well as in [the] Richmond-Henrico area" thus qualifying him to testify in light of the principle most recently stated by us in *Bly* and *Little*, that is, the standard of due medical care applicable to specialists is that of other like specialists in good standing practicing in the same or similar localities as the defendants. 216 Va. at 652, 222 S.E.2d at 788; 217 Va. at 74, 225 S.E.2d at 390. We do not agree with the plaintiff's contention.

Whether a witness is qualified to express an opinion as an expert is a question largely within the sound discretion of the trial court. *Swersky* v. *Higgins*, 194 Va. 983, 985, 76 S.E.2d 200, 202 (1953). A decision to exclude a proffered expert opinion will be reversed on appeal only when it appears clearly that the witness was qualified. *Landis* v. *Commonwealth*, 218 Va. 797, 800, 241 S.E.2d 749, 751 (1978). And the expressed belief of a witness that he is an expert does not *ipso facto* require his qualification. *See Commonwealth* v. *Larkin*, 88 Va. 422, 424, 13 S.E. 901, 902 (1891). The facts must show that he possesses sufficient knowledge, skill or experience to make him competent to testify as an expert on the subject matter of the inquiry. *Id.*

The record shows that Kramer professed familiarity with the standard of practice in the Richmond area. Even though he indicated generally that the standards for diagnosis and treatment of this disease were the same statewide, and even nationwide, neither Kramer nor any other plaintiff's witness established that the Richmond metropolitan area was similar to Fairfax County, where Kramer practiced, or to any other community with whose standards of practice Kramer was familiar. *See Bly* v. *Rhoads*, 216

Va. at 653, 222 S.E.2d at 789.[2] Thus we need not focus on the "similar community" aspect of the "same or similar community" test. We must only examine Kramer's familiarity with the standard existing at the time in question for the practice of pediatrics in the "same community", the Richmond-Henrico area, for this is what the plaintiff sought to establish.

Prior to May 1974, when the acts of negligence allegedly occurred, Kramer had practiced his specialty in Virginia for only a ten months' period and had received "some" training experience in the state while studying at Georgetown University in 1971 and 1972. Before that time his training and experience had all been acquired in Maryland, Florida and South Carolina, remote, of course, from the Richmond area.

Kramer's familiarity with the standard in the Richmond area was based only upon his claim of knowledge about the locality from reading a monthly journal of the Medical Society of Virginia, from "interacting" with physicians from all parts of Virginia (presumably including Richmond) "periodically" at medical meetings, and from teaching, in Fairfax, students from the Medical College of Virginia who intended to specialize in family practice thus permitting him to have "discourse" with physicians in the college teaching program in Richmond.

While the knowledge necessary to qualify one to testify as an expert may be derived from study alone or experience, or both, *Norfolk & Western Ry.* v. *Anderson*, 207 Va. 567, 571, 151 S.E.2d 628, 631 (1966), the extent and depth of Kramer's study and experience was meager upon the critical fact in this case, *viz.*, the standard existing for the practice of pediatrics in the Richmond area.

Thus, we cannot say as a matter of law in this case that there has been an abuse of discretion by the court below and that it *appears clearly* that Kramer was qualified. We agree with the defendants' observations that reasonable trial judges could properly disagree upon the legal effect that Kramer's study and experience have upon his qualification and that probably some members of this court, had they presided at the trial, may have admitted Kramer's

---

[2] Contrary to plaintiff's contention, judicial notice cannot be taken of the fact that the medical communities of Richmond-Henrico and Fairfax County are "similar" because such fact is not commonly known from human experience and must be proved. *Whitfield* v. *Whittaker Memorial Hospital*, 210 Va. 176, 181, 169 S.E.2d 563, 567 (1969).

testimony. But, as defendants correctly urge, such considerations are irrelevant and, if employed, violate the appellate criteria, which are fixed in our law and set forth *supra*, for examining a trial court's discretion.

■ The plaintiff also contends that we should apply retroactively to this case a statute which became effective more than four months after the summary judgment here had been entered. The plaintiff points out that subsequent to our decision in *Bly*, reaffirming the "same or similar community" standard applicable to specialists, the 1977 General Assembly enacted Code § 8-923 (now Code § 8.01-581.12:1[3]), which, she says, mandates use of a statewide standard of care in malpractice cases. Relying on *Bain* v. *Boykin*, 180 Va. 259, 23 S.E.2d 127 (1942) (amendment enacted to statute during appeal applied retrospectively), she argues that we should now hold that the new statute controls the determination of Kramer's qualifications and requires a remand of this case for a new trial because the evidence clearly shows the witness' knowledge of the statewide standard.

We need not discuss the impact of *Bain* on this case because rejection of the plaintiff's contention is dictated by the clear language of another 1977 statute, which applies to a series of laws relating to the subject of medical malpractice. Code § 8-924 (now § 8.01-581.12:2), specifically provides, insofar as pertinent here, that the provisions of the foregoing statute relied on by the plaintiff shall not apply to any cause of action which arose prior to July 1, 1976. *See Fletcher* v. *Tarasidis*, 219 Va. 658, 250 S.E.2d 739 (1979), this day decided. This clear language is unequivocal. Thus, because the cause of action here arose before July 1, 1976, the plaintiff's contention for retroactive application has no merit.

For these reasons, the judgment of the trial court will be

*Affirmed.*

---

[3] § 8.01-581.12:1. **Standard of care; expert testimony.**—In any action against a physician, dentist, nurse, hospital or other health care provider to recover damages alleged to have been caused by medical malpractice where the acts or omissions so complained of are alleged to have occurred in this Commonwealth, the standard of care by which the acts or omissions are to be judged shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth; provided, however, that the standard of care in the locality or in similar localities in which the alleged act or omission occurred may be applied if, after considering the health care services and health care facilities available in such locality and the customary practice in such locality or other similar localities, it is determined that the local standard of care is more appropriate than a statewide standard.