Judith RICHARDSON

v.

Louis A. FUCHS & Orthopedic Specialists, Inc.[1]

No. 84–177–Appeal.

Supreme Court of Rhode Island.

April 6, 1987.

**1.** The complaint against Orthopedic Specialists, Inc., is based upon its status as the employer of Dr. Louis Fuchs, a fact that was stipulated to by the parties. Our statements with regard to Dr. Fuchs should be interpreted as applying to both defendants.

Francis P. Castrovillari, Providence, for plaintiff.

Raobert W. Lovegreen, Gidley, Lovegreen & Sarli, Providence, for defendant.

## OPINION

FAY, Chief Justice.

In this medical-malpractice action originally brought in Superior Court, the plaintiff appeals from the grant of a directed verdict to the defendants. The plaintiff claims that the trial justice erred in refusing to permit her expert witness to testify, and that in any event the evidence as presented entitled her to go to the jury. We affirm.

The pertinent facts are as follows: On the morning of June 7, 1975, plaintiff, Judith Richardson (Richardson), fell down the stairs in her mother's home. Complaining of pain in her right arm, she was taken to the emergency room at the Miriam Hospital. X rays were taken of her right shoulder, elbow, wrist, and skull. She was then examined by defendant, Dr. Louis Fuchs (Dr. Fuchs), who as the orthopedic surgeon covering the emergency room that day determined that she had a "transverse fracture of the midshaft of the right humerus" —a break straight across the bone extending from the shoulder to the elbow. Doctor Fuchs applied a coaptation splint to Richardson's upper arm to keep the bone in position.[2] He then prescribed some medication for pain and instructed Richardson to have her arm checked at the hospital's fracture clinic later that week.

The next day Richardson experienced quite a bit of pain. Noticing that the splint was becoming loose as the swelling in her arm decreased, she went to Dr. Fuchs's office on the following day, June 9. At that time Dr. Fuchs tightened the splint and told her to make an appointment with the clinic to have it checked again. It is disputed whether Dr. Fuchs took any X rays of Richardson's arm when he tightened the splint. Richardson claims that he did not; however, Dr. Fuchs introduced an X ray into evidence that he testified was taken that day.

On June 18 Richardson went to the fracture clinic, having been in considerable pain during the preceding week. She was examined by Dr. Ronald C. Hillegass, another orthopedic surgeon, who confirmed the earlier diagnosis after taking another X ray. He applied a "sugar tong" cast to Richardson's upper arm instead of the coaptation splint, hoping thereby to remedy the slight

---

2. This splint was constructed by inserting several wooden tongue depressors into slots in a piece of felt, wrapping the felt around Richardson's arm, and securing it in place with tape.

angulation of the bone he had noted on the X ray.[3] Richardson's arm remained in this splint, which Dr. Hillegass readjusted on several occasions, until July 25, 1975, when it was removed and replaced by a sling. The sling was removed on August 14, 1975. In an X ray taken on September 5, 1975, Dr. Hillegass could still see the fracture line and told Richardson to return in six weeks for a checkup. Richardson did not return until May 28, 1976, at which time Dr. Hillegass noted that she had motion at the fracture site and was having pain in the arm and difficulty using it. X rays revealed a nonunion of the fracture, and Dr. Hillegass recommended that Richardson undergo surgery to correct it. Richardson did not contact Dr. Hillegass again.

On June 2, 1977, Richardson filed a complaint in Superior Court, alleging that Dr. Fuchs had negligently diagnosed and treated her fractured right arm and negligently failed to inform her of the consequences of such treatment. As a result, she alleged, she sustained severe and permanent injuries to her right arm.

During the course of trial, Richardson attempted to introduce expert testimony from Dr. John H. Heller, a former instructor of pathology and assistant professor of internal medicine at Yale University School of Medicine, concerning (1) the reasons why the bones in her arm did not unite and (2) the question of whether Dr. Fuchs had deviated from the standard of care followed by orthopedic surgeons in Rhode Island or similar localities when treating fractures of the midshaft of the humerus by applying a coaptation splint instead of a cast. Acknowledging that he was not qualified to testify as to the standard of care in Rhode Island, Dr. Heller attempted to testify as to the standard in Connecticut. The defendant objected, questioning his competence to so testify, and the trial justice conducted a hearing to resolve the issue. Finding that Dr. Heller based his claim of qualification upon conversations that he had had within the previous month with five orthopedists in Connecticut, the trial justice concluded that Dr. Heller was not personally familiar with the standard of care in Connecticut in 1975, sustained defendants' objection, and excluded Dr. Heller's testimony.

Doctor Hillegass next testified concerning his treatment of Richardson's arm, as did Dr. Richard Bertini, who had seen her in 1982 subsequent to an automobile accident in which she was involved. At the close of all of the evidence, the trial justice granted defendants' motion for a directed verdict, finding that Richardson had failed to prove through expert testimony that Dr. Fuchs had deviated from the standard of care provided by orthopedic specialists in Rhode Island to persons in her circumstances. Richardson claims error in the exclusion of Dr. Heller's testimony and the direction of a verdict against her.

## I

### THE EXCLUSION OF DR. HELLER'S TESTIMONY

The determination of the competency of an expert witness to testify is within the discretion of the trial justice, the exercise of which we shall not disturb in the absence of clear error or abuse. *Greco v. Mancini*, 476 A.2d 522, 525 (R.I. 1984); *Lacey v. Edgewood Home Builders, Inc.*, 446 A.2d 1017, 1018 (R.I. 1982). In making such a determination, the trial justice must take into account the natural tendency of the jury to place greater weight on the testimony of one qualified as an expert. *Morgan v. Washington Trust Co.*, 105 R.I. 13, 18, 249 A.2d 48, 51 (1969). Accordingly, the expert witness must possess "special knowledge, skill or information about the subject matter acquired by study, observation, practice or experience," so that the testimony given will aid the jury in its search for the truth. *Id.*

Evidence concerning the question of whether a physician has used proper

---

3. A sugar-tong cast resembles the tweezer-like utensil used to pick up sugar cubes from a bowl. Made of plaster, the cast is U-shaped and extends from under the armpit, down the inner side of the arm and then up the other side of the arm. It is open in the front and back and is held in place by an elastic bandage.

skill and diligence in diagnosing or treating a medical condition must be supplied by experts unless the lack of care is so obvious as to be within the layman's common knowledge. *Young v. Park,* 417 A.2d 889, 893 (R.I. 1980); *Wilkinson v. Vesey,* 110 R.I. 606, 613, 295 A.2d 676, 682 (1972). The expert must measure the care that was administered against the degree of care and skill ordinarily employed in like cases by physicians in good standing engaged in the same type of practice in similar localities. *Schenck v. Roger Williams General Hospital,* 119 R.I. 510, 515, 382 A.2d 514, 517 (1977); *Wilkinson v. Vesey,* 110 R.I. at 613, 295 A.2d at 682. Thus, to have been qualified to testify, Dr. Heller would have had to possess special knowledge about the relevant standard of care, acquired by "study, observation, practice or experience."

■ Doctor Heller had never been in private practice, nor did he claim to be an orthopedic specialist. His credentials, all acquired in a university setting, were, however, clearly impressive. In 1946 and 1947 he served in the Department of Pathology at Yale University School of Medicine. In 1948 and 1949 he was an assistant physician and from 1949 through 1954 an associate physician at Yale-New Haven Hospital. In 1951 and 1952 he was an assistant professor of internal medicine at Yale University School of Medicine, which position involved a dual appointment both in physiology and internal medicine. He also served as professor of interdisciplinary studies at the New England Institute until 1981, when he retired as professor emeritus. From 1973 to 1981 he was involved as coinvestigator with a professor of surgery at Yale in the development and clinical trial of new drugs to treat primary cancer of the breast and its metastasis to the bone and other organs.

It is evident from the record that Dr. Heller was well versed in the physiology of bone healing, having been involved over several years in a research project using radioactive calcium to measure the dynamics of bone healing in its earliest stages and the effects upon the process of various stimulants and retardants; having experimented in the use of radiation therapy to spot-treat fractures in patients with metastatic bone disease; and having lectured at the University of Connecticut on various aspects of bone healing.

However, when asked specifically upon what basis he claimed to be qualified to testify regarding the standard of care in Connecticut for the orthopedic treatment of fractures—the subject matter of his intended testimony—Dr. Heller testified to no such in-depth experience.[4] He cited discussions that he had had in the previous month with five board-certified orthopedic specialists in Connecticut and New Hampshire, varying in length from one-half hour to one and a half hours, concerning the various ways of treating fractures of the humerus and the pros and cons of each. In addition, he cited his personal experience in the hospital during the relevant period with patients with fractures, in setting approximately twelve fractures similar to Richardson's while in the Navy during World War II, and in setting such fractures suffered by his own family members.

According to Dr. Heller's own testimony, however, the patients with fractures with whom he dealt in the course of his research in the hospital were treated orthopedically by other physicians—his area of treatment being the patient who was fracture prone and not the fracture itself. He did not claim to have observed the orthopedic treatment of these patients directly or to have been involved in an assessment of such treatment. The circumstances in which he practiced and the techniques he employed while in the Navy were not necessarily comparable to those in Connecticut approximately thirty years later. Finally, information about techniques used in Connecticut gained from single conversations with individual orthopedists in preparation for trial do not clearly rise to the level of

---

4. The defendants raised no objection to the claimed similarity of Connecticut and Rhode Island orthopedic practice but only to Dr. Heller's competence to testify concerning the standard of care in Connecticut.

knowledge or information gained from "study, observation, practice or experience" that a qualified expert is required to possess. In fact, Dr. Heller's perceived need to contact these specialists undercuts his claim of familiarity with the standard of care based on his personal experience.

Thus, we cannot find as a matter of law that the trial justice abused his discretion and clearly erred in excluding Dr. Heller's testimony. *Cf. Noll v. Rahal*, 219 Va. 795, 250 S.E.2d 741 (1979)(no abuse of discretion in excluding testimony of board-certified pediatrician practicing in Falls Church, Virginia, where claim of familiarity with standard of care for pediatricians in Richmond was based on reading a state monthly journal; interacting with physicians from Richmond periodically at monthly meetings; and teaching residents from medical college in Richmond, which allowed for "discourse" with physicians in the teaching program there); *Loftus v. Hayden*, 391 A.2d 749 (Del. 1978)(no abuse of discretion where familiarity with community consisted of brief contacts in community, examinations of some medical records, conversations with a number of local practitioners, and some reading of local publications).[5] *See generally* Annot. 37 A.L.R. 3d 420 (1971).

We stress that neither this opinion nor the decision of the trial justice is based upon the fact that Dr. Heller was not an orthopedic specialist. *Cf. Schenck*, 119 R.I. at 521, 382 A.2d at 520 (fact that cardiologist not an expert in hospital administration or emergency-room care goes to weight of testimony and not competence to testify in negligence action against hospital for failing to equip emergency room with machines to take electrocardiograms).[6] Nor do we mean to suggest that the expert must have performed the particular procedure involved. *See generally* Annot. 46 A.L.R. 3d 275 (1972). We merely find that the experience testified to by Dr. Heller relative to the critical fact in this case—the standard existing for the practice of orthopedics in Connecticut and similar localities—did not show him to be so clearly qualified as to warrant the conclusion that the trial justice abused his discretion by excluding his testimony relevant to that fact.

Richardson also claims that the trial justice erred by refusing to permit Dr. Heller to testify concerning the dynamics of bone healing and the reasons why her fracture failed to unite. It is evident from the record that the trial justice found Dr. Heller incompetent to testify only with regard to Dr. Fuchs's alleged deviation from the standard of care and that Richardson made no further attempt to elicit testimony from Dr. Heller on any other aspect of the case. Richardson clearly cannot claim error in the exclusion of evidence that she did not attempt to introduce.

## II

## THE DIRECTED VERDICT

In reviewing a motion for directed verdict, this court must view the evidence in the light most favorable to the party against whom the motion has been made. *Drew v. Wall*, 495 A.2d 229, 231 (R.I. 1985). The motion will be denied "if there is evidence supporting the nonmoving party or [if] there is evidence on which reasonable minds could differ." *Fiske v. MacGregor, Division of Brunswick*, 464 A.2d 719, 723 (R.I. 1983); *Marcotte v. Harrison*, 443 A.2d 1225, 1229 (R.I. 1982).

Richardson claims that Dr. Hillegass testified that the usual procedure in treating

---

5. Although the cases cited deal with the competence of an expert from one locality to testify regarding the standard in another, the basis upon which the claim of competence is made in each case is comparable to the basis upon which Dr. Heller claimed to be qualified in this case.

6. We have ruled similarly when expert medical testimony has been introduced for purposes other than to establish a deviation from the standard of care. *See Schenck v. Roger Williams General Hospital*, 119 R.I. 510, 521, 382 A.2d 514, 520 (1977)(cardiologist competent to testify concerning patient's psychiatric problems allegedly caused by negligent misdiagnosis); *Lantini v. Daniels*, 104 R.I. 572, 578, 247 A.2d 298, 301 (1968)(physician, not a specialist in psychiatry, competent to testify on the question of petitioner's mental condition as it affected his ability to return to work).

fractures was to take two X rays on a follow-up visit. Taken in the light most favorable to her, she continues, the evidence shows that Dr. Fuchs took no X rays during her follow-up visit on June 9, 1975, establishing a deviation from the standard of care sufficient to go to the jury. We disagree.

■ Asked on direct examination if he had an opinion concerning whether the average practitioner in the State of Rhode Island, in the circumstances of Dr. Fuchs at the time of the follow-up visit, would have taken X rays to determine whether the alignment was being properly maintained, Dr. Hillegass responded:

> "I really don't have a definite opinion on that. I think that without giving you a yes or no answer, I think that a lot depends on, one, how you feel the thing would line up clinically, and when you might be taking x-rays again; again, the healing, the healing process of this is from the initial treatment. * * * Probably the critical time is a little later. In other words, you still have some time to move things around. * * * So I really couldn't——you know, I really in good conscience can't answer whether * * * when the splint was readjusted whether you would get a new x-ray. I probably would have taken a new x-ray to see where we were, but * * *."

Doctor Hillegass thus clearly did not testify that the failure to take the X rays constituted a deviation from the standard of care but only that he probably would have taken X rays in similar circumstances.

Such testimony does not meet our requirements under *Wilkinson* and *Schenck*. Accordingly, Richardson's argument fails.

■ Alternatively, Richardson contends that the pages of the medical textbook, Brashear and Raney, *Shand's Handbook of Orthopaedic Surgery* (9th ed. 1978), which she introduced into evidence in accordance with G.L. 1956 (1985 Reenactment) § 9–19–30, indicated that Dr. Fuchs deviated from the applicable standard of care. We find this assertion unsupported after an examination of that exhibit. Furthermore, as noted earlier, we have clearly established that expert testimony is required to establish deviation from the standard of care when the lack of care is not so evident as to be obvious to a lay person. *Wilkinson v. Vesey*, 110 R.I. at 613, 295 A.2d at 682. Although under § 9–19–30 statements in a treatise are admissible in a medical-malpractice action as evidence tending to prove the facts or opinions they contain,[7] they cannot be relied upon in the absence of other evidence to establish deviation from the standard of care.

Accordingly, the plaintiff's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers in the case are remanded to the Superior Court.

---

7. General Laws 1956 (1985 Reenactment) § 9–19–30 in pertinent part provides:

> "Certain statements of fact or opinion admissible in evidence in civil actions for malpractice.—Statements of facts or opinions on a subject of science or art contained in a published treatise, periodical, book or pamphlet shall, insofar as the court shall find that the said statements are relevant and that the writer of such statements is recognized in his profession or calling as an expert on the subject, be admissible in civil actions for malpractice, error or mistake against physicians, surgeons, dentists, optometrists, hospitals and sanitaria, as evidence tending to prove said facts or as opinion evidence * * *."