PRESENT: All the Justices

KAYLA HOLT, AN INFANT,
BY AND THROUGH HER PARENT
AND NEXT FRIEND, MICHELE HOLT

v. Record No. 161230

DIANA CHALMETA, M.D., ET AL.

OPINION BY
JUSTICE S. BERNARD GOODWYN
February 22, 2018

FROM THE CIRCUIT COURT OF FAUQUIER COUNTY
Herman A. Whisenant, Jr., Judge Designate

In this medical malpractice appeal, we consider whether the circuit court erred when it

refused to qualify plaintiff's only proposed expert witness, citing Code § 8.01-581.20, and

granted summary judgment for the defendants.

BACKGROUND

Kayla Holt (Kayla) was born on May 6, 2006 at 1:02 a.m. in Fauquier Hospital.

Although she initially breathed normally, Kayla stopped breathing on her own at 1:12 a.m. The

nurses present noted her respiratory distress and began assisted breathing such that Kayla began

breathing with supplemental oxygen. However, Kayla continued to exhibit signs of respiratory

distress. Kayla's chart indicates that Kayla's nose was "abnormal" in that it "appears to be

blocked," that her "respirations [were] labored," and that she exhibited "grunting," "nasal

flaring" and "rhonchi" (low-pitched wheezing that resembles snoring).

The nurses paged Dr. Diana Chalmeta (Dr. Chalmeta), the on-call pediatrician, who was

employed by Piedmont Pediatrics (Piedmont). Dr. Chalmeta responded that she was coming in

and ordered additional tests. At 3:05 a.m., Dr. Chalmeta unsuccessfully attempted to pass a

catheter through Kayla's nostrils. Dr. Chalmeta ordered that Kayla receive supplemental oxygen via an "oxyhood," which remained in place until Kayla was intubated at 9:25 a.m.[1]

At 8:00 a.m., Dr. Chalmeta again unsuccessfully attempted to pass a catheter through Kayla's nostrils. Dr. Chalmeta then spoke with a physician at the University of Virginia Hospital, and Kayla's chart indicates, "decision to transport to U.Va." At 8:30 a.m., Kayla's oxygen saturation was measured at 79%. At 9:25 a.m., Dr. Chalmeta established an airway by intubating Kayla, and at 10:00 a.m. Kayla was transported to the U.Va. pediatric intensive care unit.[2]

Upon arrival at U.Va., healthcare providers opined that Kayla had a condition known as pyriform aperture stenosis, or nasal stenosis. The personnel at U.Va. performed a stenting procedure to increase the size of her nostrils. By that point, Kayla had suffered a hypoxic brain injury.

On November 17, 2014, Michele Holt (Holt), Kayla's mother, filed a medical malpractice lawsuit on Kayla's behalf in the Circuit Court of Fauquier County. The case proceeded to trial on a second amended complaint against Dr. Chalmeta, Piedmont, Fauquier Hospital and several nurses, but only the counts against Dr. Chalmeta and Piedmont, as her employer (collectively, Dr. Chalmeta) are before the Court in this appeal. Holt alleges that Dr. Chalmeta was negligent in numerous ways, three of which are relevant here: failure to (1) adequately assess Kayla's

---

[1] An oxyhood is a plastic dome containing warm, moist oxygen that is used for babies who can breathe on their own but need extra oxygen. MedlinePlus, *available at* https://medlineplus.gov/ency/article/007242.htm (last visited 2/15/18).

[2] The parties also use the term "NICU" – neonatal intensive care unit; as is relevant here, the terms are interchangeable and both designate a higher level of care. *See* MedlinePlus, NICU Staff, *available at* https://medlineplus.gov/ency/article/007241.htm (last visited 2/15/18).

respiratory distress; (2) transfer Kayla to a higher care facility sooner; and (3) secure Kayla's airway sooner. Holt asserts that, as a result of such negligence, Kayla suffered a severe brain injury that substantially impairs her physical and cognitive abilities, requires extensive rehabilitation, and causes physical and mental anguish.

Prior to trial, Holt identified Dr. Funlola Aboderin (Dr. Aboderin) as her only standard of care and causation expert witness. Dr. Aboderin is a board-certified pediatrician of more than 26 years and a neonatologist[3] who practices in hospitals in Maryland and Washington, DC. She had a license to practice medicine in Virginia during the relevant timeframe of this case. Dr. Aboderin's expert designation indicated, in relevant part, that

> Dr. Aboderin is expected to educate the jury about the care of a neonatal patient such as Kayla Holt, including the assessment, care and immediate treatment of infant respiratory distress with choanal or nasal stenosis. . . .

> Dr. Aboderin is expected to testify that Dr. Chalmeta deviated from the standard of care. When Dr. Chalmeta was presented with an infant in respiratory distress and was unable to pass the catheter through either nares at approximately 2:40 am, she had a duty to secure an airway for Kayla, either through intubation or use of a mouth guard. She failed to do either. Since Fauquier Hospital was not equipped to care for Kayla's nasal stenosis, the standard of care required Dr. Chalmeta to immediately transfer Kayla to another facility right away after securing her airway. She breached that duty. Infants are obligate nose breathers, and it was a breach of the standard of care to allow Kayla, who was in obvious respiratory distress to remain without a secure airway throughout Dr. Chalmeta's care of her. Use of an oxyhood did not alleviate the requirement to secure an airway in the presence of nasal stenosis and respiratory distress and to transport her to a facility equipped to deal with her condition.

Dr. Chalmeta did not object to the designation.

During the jury trial on May 5, 2016, Dr. Aboderin testified about her qualifications. She answered that she was seeing newborns as a pediatrician during the 2005 to 2007 timeframe, and

---

[3] A neonatologist is a pediatrician with special training in caring for babies who are sick and require intensive care after birth. *See* MedlinePlus, NICU Staff, *available at* https://medlineplus.gov/ency/article/007241.htm (last visited 2/15/18).

she was familiar with respiratory distress in newborns.  Dr. Aboderin testified that she practiced

at a hospital affiliated with Johns-Hopkins University and that "[a]s a neonatologist on a daily

basis [she] see[s] babies in the newborn nursery . . . [and] any baby that's critical or needs to

come to the intensive care for . . . any breathing problems."  She also teaches and supervises new

physicians, interns, nurses, and residents concerning pediatrics, and was doing so in 2006.

Dr. Aboderin agreed that she was "familiar with the standard of care required of

pediatricians providing care for newborns in 2006," and "with the standard of care required of

pediatricians in 2006 . . . when presented with a newborn with respiratory distress."  Dr.

Aboderin testified that the standard of care for assessing a newborn baby with a potentially

blocked airway was the same for a pediatrician whether practicing in a hospital with a NICU or

without such a facility.

Dr. Aboderin stated that she was familiar with the standard of care with regard to

assessing newborns to determine whether they had a patent airway,[4] and in deciding when an

oral airway needed to be secured.  She testified that in 2006, she had an active clinical practice

that included assessing newborns to determine whether they had a blocked airway, and that she

was "familiar with the standard of care required of a pediatrician to make the decision whether to

use an oral airway."  She stated that the standard of care for these issues was "absolutely" the

same whether the hospital had a NICU or not.

Additionally, Dr. Aboderin answered that she had "an active clinical practice or [was]

familiar through [her] work with other pediatricians of the standard of care back in 2006 for

when a pediatrician in a hospital such as Fauquier Hospital was required to make the decision to

---

[4] A patent airway is one that is open and clear, where the patient is able to inhale oxygen and exhale carbon dioxide.

4

transport a newborn to a higher level of care." She stated that, although she did not work in a hospital like Fauquier, which did not have a NICU, she was familiar with the standard of care for treatment of newborns in such facilities, because, "working in a high-level care NICU, [she received] calls from those pediatricians in lower-level care wanting to transfer babies to us," providing her with "the opportunity back in 2006 to discuss the standard of care . . . of pediatricians in a lower level hospital."

On cross-examination regarding her qualifications to testify as an expert, Dr. Aboderin acknowledged that in a 2014 deposition she stated that she had not placed oral airways until 2013, but stated that the deposition testimony was incorrect because she "couldn't remember, but [she] had," and she "believed" the "last time [she] placed an oral airway was . . . in 2004." She agreed that, as of May 2006, she had never been "called upon at the bedside to insert an oral airway into a baby" "in a facility without NICU resources," but noted that she had taught and performed the procedure outside of that timeframe.

She conceded that she did not have an "office-based pediatric practice," but reiterated that she is board-certified as a general pediatrician and that "the care and stabilization of a newborn is what a pediatrician does and it's what a neonatologist does." She also conceded that she had never worked in a hospital without a NICU, and that she had never been to Fauquier Hospital and was not familiar with its resources.

Additionally, she maintained that, although she did not know Fauquier Hospital's procedures for what would "trigger immediate transfer of a patient . . . to a higher level of care," and that she had never been the transferring physician in such a scenario, "any hospital's procedure, the standard of care would be the same in when to transfer . . . knowing that you do not have a NICU." She added that, in reviewing Kayla's chart, she was "very surprised at the

5

delay in getting [Kayla] to [a higher level] care facility" because she often receives transfers from smaller hospitals without NICUs, and "those pediatricians call us in a timely manner to transfer babies to a higher level of care."

Finally, she agreed that she did not treat infants under oxyhoods between 2005 and 2007, but asserted that the standard of care for management under any breathing support is the same.

After voir dire, Dr. Chalmeta moved to exclude Dr. Aboderin as an expert witness on the ground that she failed to meet the two-prong test of Code § 8.01-581.20(A), which governs qualification of medical malpractice expert witnesses. She argued that Dr. Aboderin did not meet the "knowledge prong" because Dr. Aboderin "parroted back, yes, I know the standard of care," but the facts "don't demonstrate it and they can never demonstrate it because she has never been in the shoes of Dr. Chalmeta."

Second, she argued that Dr. Aboderin also did not meet the "active clinical practice prong" of the statutory qualification requirements, as expounded upon by *Hinkley v. Koehler*, 269 Va. 82, 89-90, 606 S.E.2d 803, 807 (2005), *Fairfax Hosp. Sys. v. Curtis*, 249 Va. 531, 536-37, 457 S.E.2d 66, 70 (1995), and *Perdieu v. Blackstone Family Practice Ctr.*, 264 Va. 408, 419-20, 568 S.E.2d 703, 710 (2002), which requires that an expert has engaged in the actual performance of the procedure at issue within one year of the allegedly negligent conduct. She noted that Dr. Aboderin (i) had never worked in a hospital without a NICU; and had not, during the relevant time, (ii) provided hands-on care to a baby requiring an oral airway; or (iii) cared for an infant with an oxyhood; and (iv) had never had to decide when to transfer a patient such as Kayla.

Holt responded that Dr. Aboderin met the knowledge requirement because she was a Virginia-licensed, board-certified pediatrician and standard of care instructor during the relevant

6

period. She argued that Dr. Aboderin met the clinical practice standard because *Hinkley* "very specifically says that the active clinical practice need[] not address whether the expert has taught in the exact same thing and done the exact same thing but it could be something similar," and Dr. Aboderin "had an active clinical practice in making determinations of whether or not an infant was in respiratory distress," "in assessing whether or not an infant needed an airway secured, whether by oral guard or by intubation," and "in making decisions as to whether or not a neonate needed transfer," and "[t]he fact that she was on the receiving end of the transfer versus the sending end doesn't make a difference."

The court sustained Dr. Chalmeta's objection. Thus, Dr. Aboderin was excluded from testifying as an expert witness. Thereafter, Dr. Chalmeta moved for summary judgment, arguing that, because Dr. Aboderin was Holt's only expert witness, Holt was unable to establish that Dr. Chalmeta breached the standard of care, or that any breach was the proximate cause of Kayla's injuries. The court granted the motion for summary judgment.

Holt proffered, in relevant part, that "Dr. Aboderin would have testified that Dr. Chalmeta failed to adequately assess the respiratory distress of [Kayla], failed to transfer [Kayla] to another facility better equipped to care for her nasal stenosis, [and] failed to secure an airway in the presence of respiratory distress and nasal stenosis," providing specifics regarding each alleged breach, and that such breaches proximately caused Kayla's hypoxic brain injury by depriving her of oxygen.

On May 25, 2016, the circuit court entered an order dismissing with prejudice Holt's complaint against Dr. Chalmeta and Piedmont. Holt appeals.

In her first assignment of error, Holt asserts that:

The Circuit Court erred in finding that Dr. Aboderin did not meet the qualifications necessary under Virginia Code § 8.01-581.20 (1950) to testify as an

7

expert witness in the assessment and care of a newborn with respiratory distress despite voir dire demonstrating that she possessed the required knowledge of the standard of care and that she had an active clinical practice in the performance of the procedures at issue.

ANALYSIS

"A trial court's exercise of its discretion in determining whether to admit or exclude evidence will not be overturned on appeal absent evidence that the trial court abused that discretion." *May v. Caruso*, 264 Va. 358, 362, 568 S.E.2d 690, 692 (2002) (citing *John v. Im*, 263 Va. 315, 320, 550 S.E.2d 694, 696 (2002)). Likewise, "whether a witness is qualified to testify as an expert is 'largely within the sound discretion of the trial court.'" *Perdieu*, 264 Va. at 418, 568 S.E.2d at 709 (quoting *Noll v. Rahal*, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979)); *see also Swersky v. Higgins*, 194 Va. 983, 985, 76 S.E.2d 200, 202 (1953). However, in an action alleging medical malpractice, we will overturn a trial court's exclusion of a proffered expert opinion "when it appears clearly that the witness was qualified." *Perdieu*, 264 Va. at 418, 568 S.E.2d at 709 (quoting *Noll*, 219 Va. at 800, 250 S.E.2d at 744).

"Any health care provider who is licensed to practice in Virginia shall be presumed to know the statewide standard of care in the specialty or field of practice in which he is qualified and certified." Code § 8.01-581.20(A). In *Wright v. Kaye,* 267 Va. 510, 516, 593 S.E.2d 307, 310-11 (2004), we concluded that this statutory presumption applied to proposed experts who were "specialized in the same field of medicine as [the defendant]" with additional subspecialties.

It is undisputed that Dr. Aboderin was a board-certified pediatrician licensed in Virginia at the time that Holt was allegedly injured by Dr. Chalmeta's negligence, and that Dr. Chalmeta was practicing as a pediatrician at the time of the alleged negligence. Accordingly, the statutory

8

presumption that Dr. Aboderin knew the standard of care for Dr. Chalmeta's specialty field of medicine clearly applied.

> Under Code § 8.01-581.20(A), a witness to whom the presumption applies may nonetheless be disqualified as an expert witness if he does not meet either of two statutory requisites: (1) to "demonstrate expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards" ("knowledge requirement") or (2) to show that he had an "active clinical practice in either the defendant's specialty or related field of medicine within one year of the date of the alleged act or omission forming the basis of the action" ("active clinical practice requirement"). Conversely, "a witness *shall* be qualified to testify as an expert" if both statutory requisites are met.

*Id.* at 518, 593 S.E.2d at 311 (quoting Code § 8.01-581.20(A)) (alterations omitted) (emphasis in *Wright*). We have subsequently continued to refer to these requisites as the "knowledge requirement" and the "active clinical practice requirement." *Hinkley*, 269 Va. at 88, 606 S.E.2d at 806. In this case, the circuit court did not say whether it found Dr. Aboderin disqualified under the knowledge element or the clinical practice requirement, thus this Court must address both, because failure to satisfy either prong disqualifies a medical malpractice expert witness. *See id.*

Dr. Chalmeta argues that Dr. Aboderin failed to satisfy the knowledge requirement of Code § 8.01-581.20(A), because Dr. Aboderin offered no factual foundation to show she possessed sufficient knowledge, skill or experience to make her competent to testify as an expert on the subject matter of the inquiry in this case. Dr. Chalmeta notes that Dr. Aboderin admitted to (i) never having practiced in a non-NICU facility; (ii) never having an office-based pediatrics practice; and (iii) not knowing Fauquier Hospital's resources. She argues that, therefore, Dr. Aboderin failed to demonstrate sufficient knowledge of the standard of care applicable to Dr. Chalmeta "under the facts and circumstances presenting to her at Fauquier Hospital in May 2006, and of what conduct conforms or fails to conform to that standard." We disagree.

9

As noted above, as a board-certified Virginia pediatrician, Dr. Aboderin was presumed to know the statewide standard of care for a pediatrician practicing in Virginia. Dr. Aboderin testified that she was familiar with the standard of care required of pediatricians providing care for newborns with respiratory distress, including assessing whether they had a blocked airway, whether to secure an airway, and whether they needed a higher level of care, and that the standard of care was "absolutely" the same for all pediatricians regardless of whether their facility has a NICU. Dr. Aboderin testified that the standard of care for the diagnosis and treatment of severe infant respiratory distress in a NICU did not vary from the standard of care in a facility without a NICU. Dr. Chalmeta offered no evidence that it did. *See Griffett v. Ryan*, 247 Va. 465, 472-73, 443 S.E.2d 149, 153-54 (1994). Dr. Aboderin explained that she had experience regarding medical facilities without a NICU, both in regard to assessment and transfer, despite never having worked in one, through working with providers in lower-level facilities wishing to transfer infants to her hospital's NICU. [5] *See generally id*. In essence, according to Dr. Aboderin, the level of distress an infant is experiencing determines the level of care they need, independent of the facility's resources, and there is a level of distress at which any pediatrician should recognize that an infant needs the resources of a NICU, and the standard of care requires the provider to transfer the infant to a higher level of care as is necessary.

---

[5] It is worth noting that the evidence suggests that Fauquier Hospital's lack of a NICU did not impact Dr. Chalmeta's decisions with regard to the relevant procedures. The decision to delay intubation was not impacted by whether the hospital had a NICU or not, because ultimately Dr. Chalmeta did intubate Kayla at Fauquier, indicating that the facility had sufficient resources to perform that procedure at any time. Similarly, the decision to transfer does not appear to have been impacted by the fact that Fauquier does not have a NICU, because the level of care required is determined by assessing the infant, and then deciding whether the facility can provide such care. As it pertains to the medical issues in this case, the condition of the infant is unrelated to the hospital's capabilities.

Thus, although Dr. Chalmeta claimed that Dr. Aboderin's testimony was without basis, there was no evidence to counter the presumption that Dr. Aboderin was knowledgeable concerning the standard of care in a medical specialty in which she was board-certified to practice. In *Jackson v. Qureshi*, 277 Va. 114, 123, 671 S.E.2d 163, 168 (2009) (alterations omitted), we considered the expert's deposition testimony on such a point sufficient when he stated that "'all pediatricians who care for acutely ill children, regardless of whether they are emergency department physicians or pediatric infectious disease physicians or general pediatricians should appreciate how pertussis can present in an infant.'" Similarly, here, Dr. Aboderin testified that all pediatricians, regardless of the setting, should be able to assess the severity of respiratory distress, decide whether and how to secure an airway, and obtain the proper level of care. "The trial court was not entitled to ignore [Dr. Aboderin's] uncontradicted testimony that the standard of care for the performance of [assessing newborn respiratory distress] was common" for a pediatrician working in both NICU and non-NICU settings. *Sami v. Varn*, 260 Va. 280, 284, 535 S.E.2d 172, 174 (2000). The argument that her testimony was properly excluded because of her lack of knowledge is unavailing.

In order to satisfy the second prong stated in Code § 8.01-581.20(A), an expert must have "'had active clinical practice in *either* the defendant's specialty *or* a related field of medicine within one year of the date of the alleged act or omission forming the basis of that action.'" *Sami*, 260 Va. at 283, 535 S.E.2d at 174 (quoting Code § 8.01-581.20(A) (emphases added)). There is clear evidence that Dr. Aboderin had an active clinical practice during the relevant time period. However, there is a question of fact as to whether that active clinical practice was in pediatrics or a related field of medicine. "[I]n applying the 'related field of medicine' test for the purposes of § 8.01-581.20, it is sufficient if in the expert witness' clinical practice the expert

11

performs the procedure at issue and the standard of care for performing the procedure is the same." *Id.* at 285, 535 S.E.2d at 175 (finding the active clinical practice of an outpatient OB/GYN sufficiently similar to that of an emergency room physician regarding the relevant procedure of a pelvic exam).

As we noted in *Wright*, the "issue in *Sami* was whether an obstetrician-gynecologist testifying as to the standard of care for pelvic exams performed by an emergency room physician fell within the 'related field of medicine' test when evaluating the active clinical practice requirement." *Wright*, 267 Va. at 523, 593 S.E.2d at 314. However, the related field of medicine test is not at issue in a case in which a plaintiff's expert specializes in the same field of medicine as the defendant. *Id.*

Dr. Chalmeta is a pediatrician; Dr. Aboderin is a board-certified pediatrician. Thus, the discussion regarding "actual performance of the procedures at issue," which is used to determine whether a physician falls within a related field of medicine, need not be considered if the circuit court determined that Dr. Aboderin had an active clinical practice in pediatrics, which is Dr. Chalmeta's specialty.

However, we cannot discern whether the circuit court found that the active clinical practice testimony of Dr. Aboderin established that her clinical practice was in the same specialty as Dr. Chalmeta or in a related field of medicine. Therefore, we will apply the more stringent "actual performance of procedure test" to determine whether Dr. Aboderin's clinical practice at least fell within a related field of medicine.

The phrase "actual performance of the procedures at issue in this case" is "not to be given a narrow construction inconsistent with the plain terms of the statute." *Id.* at 524, 593 S.E.2d at 314. In *Wright*, we rejected the contention that:

12

we used the phrase "actual performance of the procedures at issue" to create an active clinical practice requirement that an expert witness must have performed the same medical procedure with the same pathology in all respects as gave rise to the alleged act of malpractice at issue in order to have practiced in the defendant's specialty.

*Wright*, 267 Va. at 523, 593 S.E.2d at 314.

"[T]he term 'actual performance of the procedures at issue' must be read in the context of the actions by which the defendant is alleged to have deviated from the standard of care." *Id.* Nevertheless, the "active clinical practice" must indeed be an active practice in the defendant's specialty or in a related field of medicine. *See Hinkley*, 269 Va. at 91, 606 S.E.2d at 808 (concluding that teaching and consulting, without more, did not satisfy the active clinical practice requirement).

Whether a proffered witness meets the active clinical practice requirement is determined by reference to the relevant medical procedure. The relevant medical procedure is the act upon which the claim of malpractice is based. *Wright*, 267 Va. at 521-22, 593 S.E.2d at 313 (noting that the medical malpractice claim was not simply injury to a particular organ, but rather "the acts [the plaintiff] claims form the basis of her action and violate the standard of care are medical procedures applicable" during the treatment). In this instance, the claim of medical malpractice is based upon Dr. Chalmeta's failure to properly diagnose and treat Kayla's nasal stenosis and severe respiratory distress.[6] Holt alleged in her complaint that Dr. Chalmeta was negligent in (i)

---

[6] Holt did not allege that Dr. Chalmeta negligently established an airway with an oral guard—only that she took too long to do so by any means. Similarly, there was no allegation that Dr. Chalmeta negligently used an oxyhood—only that use of the oxyhood did not alleviate the requirement to secure an airway and transfer the patient to a higher level of care. Thus, whether Dr. Aboderin had a knowledge of the standard of care of performing these procedures in a facility without a NICU was irrelevant to the allegedly negligent procedure, which is alleged to concern assessing the severity of Kayla's distress and responding appropriately.

13

"failing to adequately assess the respiratory distress of [Kayla];" (ii) "failing to transfer [Kayla] to another facility better equipped to care for her nasal stenosis;" and (iii) "failing to secure an airway in the presence of respiratory distress and nasal stenosis" after the failed attempts at clearing her nostrils with a catheter.

In this case, the relevant medical procedures concern assessment of the severity of a newborn infant's respiratory distress resulting from nasal stenosis and responding appropriately. In essence, Holt's allegations related to Dr. Chalmeta's omissions, not acts of commission, in her assessment and treatment of Kayla's respiratory distress. Dr. Aboderin testified that in 2006, she had an active clinical practice as a pediatrician/neonatologist assessing and treating newborns, including those with respiratory problems. She testified that she saw babies in the newborn nursery of her hospital on a daily basis as well as any babies who needed intensive care for breathing problems. She testified that her practice included making the decision whether and with what method to establish an airway in a distressed infant. She also testified that, as part of her active clinical practice, she collaborated with providers at hospitals without NICUs regarding the decision to transfer an infant to a higher level of care. Although Dr. Aboderin was not, herself, a transferring pediatrician like Dr. Chalmeta, Dr. Aboderin testified that she instructed pediatricians at lower-level care facilities on the standards applicable in determining when to transfer an infant to a higher level of care, and discussed those decisions with the transferring providers.

For her field to be related to Dr. Chalmeta's specialty, Dr. Aboderin need not have performed the actual procedure within one year of the alleged negligence, but she is required to have performed that procedure, at some point, in order to prove that her specialty is related to the defendant's specialty. She is also required to have been involved in active clinical practice in

14

that related field within one year of the alleged negligence.  The provisions of Code § 8.01-581.20(A) do not set a minimum threshold amount of time a physician must spend in clinical practice to establish that such physician maintains an "active clinical practice," and this Court is not free to impose one.  *Jackson*, 277 Va. at 125, 671 S.E.2d at 169.  The statute states simply that the proffered expert must have an "active clinical practice" in the defendant's specialty or a related field of medicine "within one year" of the alleged negligent act or omission.  Code § 8.01-581.20.

The record clearly demonstrates that within the one-year timeframe, Dr. Aboderin was engaged in an ongoing clinical practice.  That clinical practice involved the procedure that Dr. Chalmeta is alleged to have performed negligently, assessing and determining treatment for newborns with respiratory distress.  *See Jackson*, 277 Va. at 125, 671 S.E.2d at 169.  Thus, the evidence presented was sufficient to show that Dr. Aboderin had the active clinical practice, in pediatrics or a related field, required for her to testify as an expert witness in this case.

CONCLUSION

In sum, the circuit court abused its discretion in refusing to qualify Dr. Aboderin as an expert witness because there was evidence that she satisfied both the knowledge and active clinical practice requirements of Code § 8.01-581.20.  Thus, the circuit court erred in entering summary judgment for Dr. Chalmeta.  Accordingly, we will reverse the judgment of the circuit court and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*